NANCY HUBBARD *et al.*

*v.*

RICHARD KIDDO.

1. POSSESSION—*what necessary to constitute.* It is not necessary that land should be inclosed with a fence, or that a house should be erected upon it, or that it should be reduced to cultivation, to constitute possession of it. Such improvements or acts of dominion over the land, as will indicate to persons residing in the immediate neighborhood who has the exclusive control and management of the land, will be sufficient to constitute possession.

2. SAME—*what is, of timber land.* If the land is a timber lot, and it is controlled and used to supply a farm in the neighborhood with fuel or rails or posts, this will constitute possession, although the land does not join the farm, and is not inclosed.

3. Where land is appropriated to such use as it is naturally fitted for, and the manner in which it is used by the person claiming title is such as to notify the public that the owner has asserted dominion over it, such acts will constitute possession.

4. EJECTMENT—*title under limitation law.* Where the plaintiff and those under whom he claims have had possession of a tract of land under claim and color of title, and paid all taxes assessed thereon for seven successive years, before the entry of the defendant thereon, the plaintiff can maintain ejectment to regain his possession under his title thus acquired.

APPEAL from the Circuit Court of Mercer county; the Hon. GEORGE W. PLEASANTS, Judge, presiding.

Messrs. PEPPER & WILSON, for the appellants.

Mr. ISAAC N. BASSETT, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

Appellants do not controvert the fact, that appellee, on the trial, established color of title acquired in good faith and seven successive years payment of taxes under such title, but they contend the testimony was not sufficient to establish possession of the land in dispute, uniting with color of title and payment of taxes, as required to constitute paramount title, and this, as

we understand the record, is the only controverted question in the case.

The southwest quarter of sec. 33, township 14 north, range 4 west, which includes the land in dispute, was sold for the taxes of 1839, and, under such sale, deeded to Alexis Phelps Nov. 24, 1843. Alexis Phelps conveyed the quarter to William Burns Dec. 1, 1843. In 1845 a judgment was obtained against William Burns in the circuit court of Mercer county, upon which an execution issued and the land was sold, and, under the sale, Willard Hubbard obtained a deed of the quarter section of land on the 6th day of September, 1847. On the 21st of September, 1851, Willard Hubbard conveyed to William Burns the northeast quarter of the tract, which is the land in dispute, and he, on the 5th day of February, 1855, conveyed to the plaintiff.

William Burns was called as a witness, and testified: "The quarter was considered brush land, although there was considerable timber on it when I bought it. I was living one and a half miles from the land, and used the forty to get timber whenever it was necessary for firewood and rail timber. I can not say definitely how much I used, but I used wood entirely for fuel and got it in that neighborhood; some I got elsewhere, but I got from the forty from year to year, as it suited me, until I sold to plaintiff. I think no one else got from it while I owned it." On cross-examination the witness said: "I lived on the prairie several years before I bought this land. I had no timber before I bought this. * * * I tried to save the timber after I bought it, and when I cut on it I claimed title." The plaintiff testified: "I have known the land twenty-six or twenty-seven years. The quarter section was pretty much all timber except two or three acres. * * * Mr. Burns used it for timber only, from the time he came to the county, twenty-eight years ago, until I got it. He owned sixty-five acres of prairie land on the south-west of 26, on which he lived, and had it in cultivation. He used the timber for rails; I saw him cut and haul them. * * * I bought

Burns' other land the same time I bought this; I reside three-quarters of a mile from the land in controversy."

On cross-examination, he said: "I saw Burns cut and haul rail timber two years before I bought it; can not say how much he cut, but I saw him once or twice cutting. * * * I took timber off two different years; I made three sides of a fence around a twelve acre tract, and also got some gate posts, and in 1862 or 1863 I got some timber for a bridge. I got the rails in 1855 or 1856, and the gate posts in 1857 or 1858."

On re-examination, the witness said: "The land had a fine. growth of young timber on it, and is more valuable for growing timber than for any other purpose, and I kept it for the young growth of timber."

It was admitted on the trial that the taxes for the years 1852, 1853 and 1854 were paid by Mr. Burns, and the taxes of 1855, '56, '57, '58, '59, '60 and 1861 were paid by the plaintiff. Were these facts sufficient to authorize the court, sitting as a jury, to find that plaintiff had color of title, seven years payment of taxes, and possession? It is not necessary that land should be inclosed with a fence or that a house should be erected upon it to constitute possession, or that it should be reduced to cultivation. Such improvements, or acts of dominion over the land, as will indicate to persons residing in the immediate neighborhood who has the exclusive control and management of the land, will be deemed sufficient to constitute possession, as was held by this court in *McLean v. Farden,* 61 Ill. 106. If the land is a timber lot, as was the case here, controlled and used to supply a farm in the neighborhood with fuel or rails or posts, such use will constitute possession, although the land may not join the farm or may not be inclosed. *Brooks* v. *Bruyn,* 18 Ill. 539.

While Burns owned the quarter section, he claimed title to the land and used it, as occasion required, to supply his farm with rails and firewood. This use of the quarter continued until the title passed to Hubbard by sale upon execution, and when, afterwards, Hubbard conveyed to him the forty acres

now in dispute, he continued to claim and use this tract in connection with his farm, until he sold to the plaintiff, and after the plaintiff acquired title, he too used the land, in the same manner and for the same purpose, until his possession was invaded by the defendants.

If this kind of possession could not be made availing, a person who had timber land would not be safe or secure in his property, unless he inclosed it with a fence or erected a house thereon and occupied it in person or by tenant. This, the law does not require. The more reasonable view is, that where land is appropriated to such use as it is naturally fitted for, and the manner in which it is used by the person claiming title is such as to notify the public that the owner has asserted dominion over the property, such acts will constitute possession. A mere reference to the circumstances under which the Hubbards, the real defendants in the action, acquired title to the land, and the manner in which they were situated in relation to it, will clearly demonstrate that, at the time they acquired title and took possession, they were fully aware of the fact that plaintiff claimed title to and was asserting ownership over the property, and that he was, in fact, in possession.

Willard Hubbard, the husband of defendant Nancy Hubbard, and the father of James W. Hubbard, and others, for whom the patent title was purchased, after he acquired Burns' title to the quarter section, went into the possession of all the quarter except the forty acres in dispute. He lived upon the land until 1857, when he died, leaving his widow and children in possession of the same. Hubbard, in his lifetime, asserted no claim to the forty acres in dispute, but a fair inference from the evidence is, he knew and recognized the title of Burns and his possession.

On the 8th day of October, 1858, the guardian of the Hubbard heirs bought the patent title in the whole quarter for the heirs, for the purpose of perfecting the title to the one hundred and twenty acres which they then occupied and owned. Two hundred dollars was paid for the title in the whole quarter.

582        WRIGHT *v.* THE PEOPLE *ex rel.*        [Sept. T.

Syllabus.

After this purchase was made, Nancy Hubbard made an effort to induce the plaintiff to pay $50, and take the patent title to his forty acres. This, he declined, and then, for the first time, the Hubbards commenced asserting title to, and dominion over, the forty acre tract in dispute. Nancy Hubbard, on her cross-examination, said: "We had no controversy about the forty acres until we bought the patent title. We did not claim any right or title to it before, nor did we use it or any part of it. * * * I knew plaintiff claimed it."

Burns was a brother of Nancy Hubbard; they resided in the same neighborhood for years, and there can be no doubt in regard to the fact that the Hubbards knew Burns and the plaintiff were in possession of the land. Our conclusion is that Burns, while he held color of title to the land in dispute, exercised such acts of ownership over the land as to warrant the court in finding that he was in possession, that color of title and possession united in Burns, and that he commenced the payment of taxes, which was continued by his grantee, who was also in possession, for the period necessary to establish a paramount title.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*