BARNES, J.,
for the Court:
¶ 1. Herman Scott (Scott) filed suit seeking damages after Anderson-Tully Company removed timber from a twenty-acre parcel of land Scott claimed to own. Scott also sought to quiet and confirm title and to enjoin Anderson-Tully from entering the land. The chancellor dismissed Scott’s claim, finding that Anderson-Tully had acquired title to the twenty acres through adverse possession. Scott appeals, arguing the chancellor erred. We find no error and affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. In 1925, brothers Stewart Scott Jr. and Willie Scott inherited an undivided one-half interest in a 584.6-acre tract of land in Jefferson County, Mississippi. The brothers’ respective estates now each own the undivided one-half-interest shares in the property (collectively referred to as “the estate”). Scott, the plaintiff, is the administrator of Stewart Scott Jr.’s estate.
¶ 3. On March 19, 2010, Scott filed suit on behalf of the estate in Jefferson County Chancery Court, alleging that its adjacent landowner to the east, Anderson-Tully, was trespassing on a portion of the estate’s property. Scott sought damages for the removal of timber, and he sought an order enjoining Anderson-Tully from entering onto or cutting and removing timber from the property. An amended complaint sought to quiet and confirm title. The disputed property is a somewhat triangular-shaped tract of land located in the northeastern corner of Section 28, Township 10 North, Range 1 East in Jefferson County.[1] Scott claims that the estate owns all property in Section 28, including the disputed acreage east of the wire fence, up to the section line between Sections 28 and 30.
¶ 4. Anderson-Tully answered the complaint and counterclaimed to quiet and confirm its own title. Anderson-Tully claimed that according to its deed, it owned the disputed twenty acres in Section 28 east of the wire fence. Alternatively, Anderson-Tully argued that it acquired title to the property by adverse possession through its possession and use of the land from 1969 to 2010.
¶ 5. A trial was held, at which Scott presented the testimony of Richard T. Logan of Logan Engineering Company. Scott had hired Logan in 2003 to determine the estate’s acreage after Scott became concerned that he was paying taxes on more property than the estate owned. Logan found that the estate owned all of Section 28, including the disputed twenty acres. Logan relied on his personal in *913 spection of the property and a plat prepared in 1944 by B.G. Miller, the county surveyor for Jefferson County at that time. Miller’s plat was prepared for a timber deed from the Scotts, and is the only recorded description of the Scotts’ land in evidence. Miller’s plat reflects difficulty in surveying the area, noting that the southern line of the Scotts’ tract “has never been accurately determined but will not vary as much as 5 acres.” Miller found that the Scotts’ property line on the east ran along the section line between Section 28 and Section 30. He noted the wire fence on the east side of the Scotts’ property and found that the “20 1/10 [acres] outside of fence is included in total acreage.” However, Miller also made a note on the plat, within the twenty acres, which states that the property is “outside of fence & may be disputed.” ■ Logan agreed with Miller’s finding that the section line, not the fence line, was the property’s border and that the twenty acres belonged to the Scotts. Logan walked the disputed property and stated that the terrain to the east of the fence was “very rough.” He found the wire fence was never intended to establish the property’s border, but rather was a “convenience fence,” or “tree[-]line fence,” built to contain livestock. Although other witnesses testified to seeing blue paint along the wire fence that was indicative of Anderson-Tully’s ownership, Logan testified that he did not recall seeing any blue paint when he surveyed the property. However, he also testified that he no longer had his field notes and was relying on his memory. Logan examined Anderson-Tully’s deed and found no conveyance of any land in Section 28 to Anderson-Tully.
¶ 6. Richard Scott, an heir of Stewart Scott Jr., lived on the Scott property from his birth in 1938 until 1953. He testified he rebuilt the old wire fence on the east side of the property in 1954 because it was in need of repair. When he rebuilt the fence, he moved it a foot or two to the west, along the tree line, because the posts had rotted and he wanted to avoid digging new post holes. According to Richard, the fence was built to contain livestock and was not the property’s border. After moving from the property in 1953, he returned every week or two to visit his father. Up until 2010, he would ride horses around the property when he visited, and would sometimes make repairs to the fence. He never saw anyone using the disputed twenty acres.
¶ 7. Anderson-Tully presented the testimony of its company surveyor and forester, E.C. Burkhardt. Burkhardt worked for Anderson-Tully from the early 1950s to 1981. Burkhardt testified that Anderson-Tully came into possession of the disputed tract on February 12, 1969, though quitclaim deed. The deed does not contain a metes-and-bounds description or plat. According to Burkhardt, when Anderson-Tully expressed interest in buying the Jefferson County land in 1969, no one, including the land’s owners, knew the acreage. Burkhardt explained that the acreage was unclear because the land in Jefferson County was some of the first land south of Ohio to be surveyed by the United States government in 1805. After complaints about irregularities, the government retraced the original lines to get the correct acreage, and it established the sectional descriptions. After this, the “southwest part of Mississippi more or less reverted to the metes[-]and[-]bounds system.” But Burkhardt testified that because the section lines are irregular, determining property lines can be difficult. So, according to Burkhardt, when surveying in the area, the “best evidence is what you find out there on the ground.... You’ve got to pay attention to the lines on the ground, evidence of possession; and quite *914 often that’s all you’ve really got to go by to determine boundary lines.” Burkhardt’s 1969 survey found that the boundary line between the Scotts’ and Anderson-Tully’s properties ran along the wire fence, making the disputed twenty acres part of Anderson-Tully’s property. Burkhardt placed flags and stakes and used blue paint to mark the boundary line along the fence. Burkhardt’s field notes reference conversations with neighboring property owners, including a Scott family member, none of whom objected to his placement of flags and stakes during his survey.
¶ 8. Anderson-Tully admitted Burk-hardt’s description, which is set out in its deed, does not specifically mention a conveyance of any land in Section 28 — the location of the disputed property. But it argues the property “is included in the description ... by reference” in the “catch-all portion of the description for the Hollywood Tract....” Anderson-Tully’s deed refers to its property as the “Pruitt” or “Hollywood” tract. Burkhardt testified that it was the seller’s intention to include the entire Pruitt or Hollywood tract in the sale of the land and that the tract included the disputed twenty acres. He testified this intention was reflected in the following “catch-all” provision in the deed:
The entire “Pruitt” place or “Hollywood” place, as now constituted, and being all of the original place except the portion thereof lying in the sixteenth or school section, is intended to be and is hereby conveyed, regardless of whether the above description be accurate and correct or not.
¶ 9. Anderson-Tully alternatively argued that if the deed did not convey the property, it owned the property through adverse possession. Starting at the time of purchase in 1969, Anderson-Tully marked its perceived boundary line along the wire fence with a particular shade of blue paint — a practice started by the company in the 1920s. The line was repainted in 1986 and 1998. Witnesses testified that the blue line along the fence was visible continuously .from 1969 through 2010, when Scott filed suit. Witnesses also testified that the particular shade of blue paint was commonly known in the community as that of Anderson-Tully. From 1969 to 2010, Anderson-Tully maintained the disputed acreage and cut and harvested timber in 1990, 1999, and 2010. The company also issued five hunting licenses to the property. Burkhardt testified that from 1969 until the end of his employment with Anderson-Tully in 1981, no one objected to his survey or interfered with Anderson-Tully’s ownership or use of the disputed tract. Burkhardt testified that if someone had regularly crossed the blue line, he would have been notified. He was never notified that the line had been crossed by anyone.
¶ 10. Wilbur Nations, upon whom much of the chancellor’s decision relied, testified for Anderson-Tully in regard to its adverse-possession claim. Nations was ninety years old when he testified, and “sharp as a tack,” according to the chancellor. Nations, coincidently, was a licensed surveyor in Alabama. Nations testified that he grew up on what he referred to as the .Hollywood tract, just east of the Scotts’ land. He lived there from 1929 to 1942, and after that would return on weekends to visit through the mid 1950s. According to Nations, the wire fence was recognized by the community as the property line, and Anderson-Tully was the owner of the property to the east of the fence. Nations testified that the Scotts had never used the disputed tract. His family, however, had used the Hollywood tract, including the disputed twenty acres, to run cattle, and they had cut timber on it. Nations recalled that as late as 1993, the Scotts cut *915 timber up to and west of the fence line, but they never cut east of the fence line. He saw blue paint marking the property’s boundary along the fence in 1980 and 1985, and again three weeks before trial. He recognized the paint color as that used by Anderson-Tully to mark its borders.
¶ 11. In 1982, Nations joined the Linwood Hunting Club, which leased hunting land from Anderson-Tully beginning in 1972. Nations was present on the property yearly during hunting season (November-January) and throughout the year on the weekends working on roads and deer stands. He testified that the hunting-club members recognized the fence as the boundary line and were aware of the blue paint used by Anderson-Tully to mark its property’s borders. From 1995 to 2007, Linwood also leased a portion of the Scotts’ property. In 2007, Scott informed Linwood that he would not renew the lease for the 2007-2008 hunting season. A dispute arose between a Linwood member ■and Scott as to the ownership of the twenty-acre tract to the east of the fence line. Subsequently, in December 2008, Anderson-Tully’s attorney sent Scott a letter stating Anderson-Tully was the owner of the disputed tract. Scott consulted an attorney in 2009, but no legal action was taken at that time. Anderson-Tully continued to treat the land as its own, and harvested timber there in early 2010. Scott approached a logger who was on the disputed tract and told him to stop harvesting the timber on the land. The logger replied that he would need something in writing to prove Anderson-Tully was not the owner and then continued harvesting. This led to Scott’s complaint filed on March 19, 2010.
¶ 12. After reviewing the parties’ property descriptions, the chancellor concluded that neither “accurately describe[s] the disputed tract to any certainty so as to read the various descriptions and know which party is the record title owner of the property.” However, the chancellor found that “the evidence overwhelmingly support[ed]” a finding of adverse possession in favor of Anderson-Tully. Scott filed a Mississippi Rule of Civil Procedure 60(b) motion for relief from judgment or, alternatively, for a new trial. A hearing was held, at which new evidence — a thirty-two-page 1984 title abstract — was admitted. After the hearing, the chancellor denied the motion. Scott appeals, arguing the chancellor erred in finding Anderson-Tully adversely possessed the disputed property.
STANDARD OF REVIEW
¶ 18. This Court “must defer to a chancery court’s findings of fact unless they are manifestly wrong or clearly erroneous.” Double J Farmlands Inc. v. Paradise Baptist Church, 999 So.2d 826, 829 (¶ 13) (Miss.2008). “[WJhenever there is substantial evidence in the record to support the chancellor’s findings of fact, those finding must be affirmed[.]” Bank of Miss. v. Hollingsworth, 609 So.2d 422, 424 (Miss.1992) (quoting Smith v. Dorsey, 599 So.2d 529 (Miss.1992)).
DISCUSSION
¶ 14. Scott argues Anderson-Tully presented insufficient evidence to prove a claim of adverse possession. Mississippi Code Annotated section 15-1-13(1) (Rev. 2012) states:
Ten (10) years’ actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title[.]
*916 “[F]or possession to be adverse[,] it must be (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful.” Blackburn v. Wong, 904 So.2d 134, 136 (¶ 15) (Miss.2004) (citing Thornhill v. Caroline Hunt Trust Estate, 594 So.2d 1150, 1152-53 (Miss.1992)). The claimant must prove each element by clear and convincing evidence. Id.

1. Claim of Ownership

 ¶ 15. To stake a claim of ownership, the possessor must “fly [his] flag over the property” in such a way as to put the actual owner on notice that the property is “being held under an adverse claim of ownership.” Apperson v. White, 950 So.2d 1113, 1117 (¶ 7) (Miss.Ct.App.2007) (citing Walker v. Murphree, 722 So.2d 1277, 1281 (¶ 16) (Miss.Ct.App.1998)). The quality, not the quantity, of acts must be considered. Id. at (¶ 8). “The mere presence of a fence, without more, [is not] sufficient to sustain a claim of adverse possession.” Double J, 999 So.2d at 829 (¶ 15).
¶ 16. After purchasing the Jefferson County property in 1969, Anderson-Tully marked its borders with its recognizable company blue paint. The blue paint ran along the wire fence erected by the Scott family and included the disputed twenty acres in Section 28. Multiple witnesses saw the paint lines between 1969 and 2010, and knew the lines marked the boundary of Anderson-Tully’s property. Thomas Middleton, a forester, performed a timber cruise at Scott’s request in 2010 to establish damages for Anderson-Tully’s removal of trees from the disputed acreage. He testified that the fence line was “distinctly painted” with blue paint. The blue paint was two different shades, indicating to him that the line had been repainted at some point. He was familiar with the blue boundary lines in the area, and he knew that the paint color was the one used by Anderson-Tully to mark its property lines. Anderson-Tully’s company records show that it painted the blue line in 1969, and repainted it in 1986 and 1998. Anderson-Tully cut and harvested timber in 1990, 1999, and 2010. It also conducted timber-stand improvements to clear the land of unwanted trees, and granted five hunting licenses to the property. The hunting licenses contained maps, which described the disputed twenty acres as part of the lease.
¶ 17. Scott asserts that regardless of Anderson-Tully’s actions, the estate has a possessory claim because he began paying property taxes on the disputed tract in 1993. The chancellor found Scott presented insufficient evidence to support his claim that he paid taxes on the disputed property. Regardless, the payment of taxes alone “is not dispositive of the claim of ownership.” Nosser v. Buford, 852 So.2d 57, 61 (¶ 17) (Miss.Ct.App.2002). Thus, we cannot find the chancellor erred in finding no merit to Scott’s argument. We find the evidence sufficient to support the chancellor’s finding that Anderson-Tully staked an ownership claim to the property from 1969 to 2010.

2. Actual or Hostile

¶ 18. “Possession is hostile and adverse when the adverse possessor intends to claim title notwithstanding that the claim is made under a mistaken belief that the land is within the calls of the possessor’s deed,” Wicker v. Harvey, 937 So.2d 983, 994 (¶ 34) (Miss.Ct.App.2006) (citing Alexander v. Hyland, 214 Miss. 348, 357, 58 So.2d 826, 829 (1952)). The adverse possessor must possess the property without the owner’s permission, because permission defeats any claim of adverse possession. Apperson, 950 So.2d at 1118 (¶ 12).
*917 ¶ 19. Anderson-Tully marked, managed, harvested timber, and issued hunting licenses on the disputed property from 1969 to 2010. Anderson-Tully did not seek anyone’s permission to use the property. Nations testified that everyone, including the Scotts, treated the wire fence as the dividing line between the properties as early as the 1980s. He recalled that as late as 1998, the Scotts cut timber only to the west of the fence line, but not to its east. The testimony established that after 1969, only Anderson-Tully used the disputed property.
¶ 20. Scott argues Anderson-Tully did not actually or hostilely possess the property because it did not care for or improve the land on a regular basis. “As a general rule, either actual or constructive occupation, cultivation or residence or use is necessary to constitute adverse possession.” Kayser v. Dixon, 309 So.2d 526, 528-29 (Miss.1975). However, “[possesso-ry acts necessary to establish a claim of adverse possession may vary with the characteristics of the land, and adverse possession of ‘wild’ or unimproved lands may be established by evidence of acts that would be wholly insufficient in the case of improved or developed lands.” Ap-person, 950 So.2d at 1117 (¶ 8) (internal quotation marks and citation omitted). The property in question is undisputedly wild or unimproved land. Thus, “the quantum of proof necessary ... to establish adverse possession over the disputed parcel is measurably lower than had the property been improved or developed.” Id. “Possession of such [undeveloped] property may be established by a continued claim evidenced by public acts of ownership.” Kayser, 309 So.2d at 529. Anderson-Tully marked the fence line with blue paint in 1969,1986, and 1998. It cut and harvested timber in 1990, 1999, and 2010. It performed timber-stand improvements, and it issued five hunting licenses. We find the chancellor had substantial support in the evidence to find that these acts were public acts of ownership sufficient to establish an actual or hostile claim of ownership.

3. Open, Notorious, and Visible

¶ 21. For possession to be open, notorious, and visible, the possessor “must unfurl his flag on the land, and keep it flying, so that the actual owner may see, and if he will, that an enemy has invaded his domains, and planted the standard of conquest.” Roberts v. Young’s Creek Inv. Inc., 118 So.3d 665, 670 (¶ 13) (Miss.Ct. App.2013) (quoting Wicker, 937 So.2d at 994 (¶ 35)).
¶ 22. The chancellor found Anderson-Tully openly and notoriously possessed the land from 1969, when it painted its boundary lines blue, until 2010, when Scott filed suit. The possession was visible, as evidenced by eyewitnesses who saw the blue paint along the fence line between 1969 and 2010. The possession was also notorious, as the fence and blue paint were recognized in the community as the dividing line between the properties. In addition to marking its borders with blue paint, Anderson-Tully cut and harvested timber, performed timber-stand improvements, and issued hunting licenses on the property. All of which were open, notorious, and visible to the public. Glynn Brown, Anderson-Tully’s regional manager over land in Jefferson County, testified that in 1990 and 1999, when timber was cut, Anderson-Tully accessed the disputed property through the Scotts’ property. Each time, the timber-cutting process took approximately a month. No one objected to their entering or cutting timber on the property. Nations testified that when loggers came onto the property, he could hear the timber being cut “a half a mile” away. *918 This evidence supports the chancellor’s finding; that Anderson-Tully’s use was open, notorious, and visible.
A Continuous and Uninterrupted for a Period of Ten Years
¶ 28. Adverse possession requires continuous and uninterrupted possession of a disputed property for at least ten years. Miss.Code Ann. § 15-1-13(1). Even if a party is mistaken as to the calls of his deed, “if he has occupied the land for the statutory period under the claim that it was his own and was embraced within the calls of his deed, he is entitled to recover on the ground of adverse possession^]” Pittman v. Simmons, 408 So.2d 1384, 1386 (Miss.1982) (quoting Alexander, 214 Miss. at 357, 58 So.2d at 829).
¶24. Anderson-Tully’s possession began upon issuance of its deed in 1969. After marking its perceived boundary lines with blue paint, it proceeded to maintain the property, harvest timber, and issue hunting licenses. Nations testified that everyone, including the Scotts, treated the fence as the dividing line and that the Scotts never used the property east of the fence. Burkhardt testified that during his employment with . Anderson-Tully from 1969 to 1981, he was never notified that anyone other than Anderson-Tully crossed the blue line.
¶ 25. Scott argues the possession was not continuous and uninterrupted because he disputed Anderson-Tully’s possession in 2003. The chancellor recognized Scott’s objection in 2003. The chancellor also noted that at some point, Scott painted an orange line along the fence line, although it was unclear when this was done. Finally, the chancellor found Scott made an indirect claim of ownership in 2007, when he cancelled the Linwood Hunting Club lease. However, the chancellor found these actions of no consequence, as Anderson-Tully’s adverse-possession claim had ripened before Scott made the first objection in 2003. The evidence supports the chancellor’s finding that Anderson-Tully’s possession was continuous and uninterrupted for ten years.

5. Exclusive

¶ 26. “Exclusive possession means that the possessor ‘evinces an intention to possess and hold land to the exclusion of, and in opposition to, the claims of all others, and the claimant’s conduct must afford an unequivocal indication that he is exercising the dominion of a sole owner.’ ” Roberts, 118 So.3d at 671 (¶ 15) (quoting Wicker, 937 So.2d at 995 (¶ 40)). Exclusive possession “does not mean that no one else can use the property.” Id. (citing Apperson, 950 So.2d at 1119 (¶ 15)).
¶ 27. No testimony was presented that the Scotts or anyone other than Anderson-Tully used the property on the east side of the fence after 1969. Scott argues Anderson-Tully “allowed the Scott [family] to lease the disputed 20 acres to [the Linwood Hunting Club].” However, no evidence was presented to support this argument. To the contrary, Anderson-Tully maintained that it leased the twenty acres to the hunting club, and it provided evidence of contracts with plats attached that included the twenty acres. Nations maintained that the Scotts only used the property to the west of the fence line; and Burkhardt testified he would have been notified if anyone had regularly crossed the blue line onto the twenty acres during his employment at Anderson-Tully. No one did. Thus, the evidence supports the chancellor’s finding that the possession for the statutory ten-year period was exclusive.

6. Peaceful

¶ 28. An adverse possessor’s use of a claimed property must be peaceful. Miss. *919 Code Ann. § 15-1-13(1). “[E]xpected disputes associated with the use or ownership of the property are not indicative of the possession not being peaceful.” Roberts, 118 So.3d at 671 (¶ 16). Burkhardt testified that from 1969 to 1981, no one objected to his survey or interfered with Anderson-Tully’s ownership or use of the disputed tract. Scott argues Anderson-Tully’s possession was not peaceful because it acted without consent in removing the timber. However, as stated, the first time Scott disputed Anderson-Tully’s use of the land was in 2003, well after Anderson-Tully’s adverse-possession claim had ripened. Thus, we find sufficient evidence in the record to support the chancellor’s finding that Anderson-Tully’s possession was peaceful.
CONCLUSION
¶ 29. Anderson-Tully openly and notoriously possessed the disputed twenty-acre tract in Jefferson County from 1969 until Scott’s complaint was filed in 2010. It marked its perceived boundary line with blue paint when it purchased the property in 1969, and repainted the boundary line in 1986 and 1998. It managed timber uninterruptedly from 1969 to 2010 and harvested timber in 1990, 1999, and 2010. No testimony was presented that the Scotts or anyone else used the disputed property after 1969. We find substantial evidence in the record to support the chancellor’s finding that Anderson-Tully proved adverse possession by clear and convincing evidence. Therefore, we find the chancellor did not abuse his discretion and affirm.
¶ 30. THE JUDGMENT OF THE JEFFERSON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Due to the fact that the property is situated in a non-standard township, a more thorough description of the property would be more of a hindrance than help to the reader. For example, Sections 28 and 30 abut each other for a short distance, and Section 29 lies below them at an angle.