# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00521-COA

ALLEN L. CRONIER AND WIFE, JANICE
STORK CRONIER, AND VICTORIA LYNN
CRONIER, A MINOR BY AND THROUGH HER
PARENT AND NEXT FRIEND, DERRICK
CRONIER

APPELLANTS

v.

ALR PARTNERS L.P., AN ALABAMA LIMITED
PARTNERSHIP, AND MKAZ PARTNERSHIP
L.P., AN ALABAMA LIMITED PARTNERSHIP

APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 04/04/2016 |
| TRIAL JUDGE: | HON. JAYE A. BRADLEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | SCOTT CORLEW |
| ATTORNEY FOR APPELLEES: | E. FOLEY RANSON |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 12/12/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND CARLTON, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     Allen Cronier appeals the judgment of the Chancery Court of Jackson County, which

found, after a bench trial, that the Rainwaterses[1] proved adverse possession of approximately

9.57 acres in Jackson County, Mississippi, which Allen claimed he owned.   Allen was

---

[1] Brothers Marshall and Austin Rainwaters are the principals/owners of ALR Partners L.P. and MKAZ Partnership L.P., which own property surrounding Allen's parcel of property.

ordered to pay the Rainwaterses' court costs and attorney fees of $10,790.05, and to remove fencing at his own cost. We affirm the chancellor's finding that the Rainwaterses had adversely possessed the property to the west and north of the Croniers' property. However, we reverse and remand the award of attorney fees to the Rainwaterses.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. On July 3, 2012, Allen and his wife, Janice, purchased eighty acres of rural wooded property in Jackson County from Herbert Bang and his wife Earlene Dobbs for approximately $225,000.[2] The property is located in an area locals refer to as "Roberts' Neck,"[3] near the Alabama border between the Big Creek and Escatawpa Rivers. The Croniers paid cash for the property. Neither the warranty deed nor the closing was handled by an attorney. On July 11, 2012, the warranty deed was recorded in the Jackson County land records. The property description in the warranty deed states the parcel is "approximately 80 acres, more or less."

¶3. Prior to the purchase, Allen, Janice, Bang, and his wife explored the property on a golf cart for several hours. Allen did not survey the property, nor did he obtain a title opinion. Allen testified that some old fence posts still stood on the southern border. After the purchase, on July 26, 2012, Allen emailed Gerald Moody Sr. (Moody) about surveying the eighty acres to identify the property's corners and stake it every 100 feet for cattle fencing. Gerald Moody Jr. (Moody Jr.) and a crew were to do the preliminary field work.

---

[2] The property is located in Section 19, Township 5 South, Range 4 West. The area in dispute is the northern one-half of the southeast quarter.

[3] Bang and Dobbs had purchased the property in 1994 from W.J. Roberts.

¶4.     The Rainwaters family had owned several thousand acres of the property surrounding the Croniers' parcel for many years, and it is currently held by ALR and MKAZ partnerships. Austin Rainwaters testified that Allen had called him before buying the property to see if "there was anything [he] needed to know." Austin informed Allen that the property corners in the area were not consistent with the theoretical section corners, but former owners of the parcel (Bang, Dobbs, and Roberts) had honored the established corners. Austin told Allen two things were important to the Rainwaterses: they needed help maintaining the road allowing access to their other property; and they wanted Allen to honor the old property lines and corners. Austin recalled that Allen stated it would not be a problem. Austin recommended Moody as a surveyor to Allen.

¶5.     During preliminary field work, Moody discovered that the Croniers' parcel was seventy and not eighty acres. The preliminary survey revealed a boundary issue with the adjoining property owned by MKAZ and ALR on the north, west, and south sides.[4] The survey map noted the northwest-corner markings and monuments included a three-fourths-inch pipe in the ground and a yellow paint blaze on a tree. The southwest corner was marked by an old fence-corner post. There were old yellow painted blazes meandering along Allen's north and west property lines. There was an old firebreak running along the western boundary of the tract. The survey stated that the northeast and southeast corners, which are not disputed, were marked by a one-and-one-half-inch pipe and a "pine knot g/w PVC pipe," respectively.

---

[4] MKAZ owns the property on the north, west, and southwest border of the Croniers' parcel. ALR owns the property on the southeast border of the disputed parcel.

3

¶6. In August 2012, Moody arranged a meeting between Allen and the Rainwaterses to discuss the issue. Allen claimed this was the first time he learned of a boundary dispute. Marshall Rainwaters testified that Allen stated that he had paid for eighty acres and said, "by God I'm going to get eighty acres . . . . I know what I've got to do." He left the meeting angry, and fired Moody's survey company.

¶7. Shortly after the meeting, the Rainwaterses went to inspect the property. Marshall testified that the yellow mark and old fence were still at the northwest corner, but the three-fourths-inch pipe marker was missing, leaving a hole. Photographs and a video were taken of the boundary and corner markers, especially of the northwest and southwest corners.

¶8. In March 2013, in an attempt to resolve the dispute, the Rainwaterses' attorney wrote a letter to Allen stating that the Rainwaterses' property had been in the family since 1947. He explained: "[h]istorically, the property boundaries of Section 19 and the other sections in this part of Jackson County do not exactly follow the quarter section lines" as seen on Moody's preliminary survey. In July 2013, the Croniers responded by letter, quoting the Bible, denying that the Rainwaterses owned the ten acres, and stating that Bang, one of the prior owners, knew "nothing about this." The letter also informed the Rainwaterses that Allen had conveyed the western ten acres of the property in dispute to the Croniers' granddaughter, who was twelve years old, reserving to Allen and his wife a life estate.[5]

---

[5] This conveyance made it necessary for the Rainwaterses later to name the Croniers' granddaughter as a defendant in their lawsuit. Allen admitted at trial that the warranty deed, executed in October 2012, was prepared in part to get the Rainwaterses to give up their claim on the disputed ten acres. The deed was not recorded until July 2013. Allen testified the delay was to see if "things changed."

4

¶9.    In September 2013, the Moodys finalized their survey of Allen's property. In October 2013, the Rainwaterses visited the property and noted that the corner markers had been moved or obliterated. Further, the yellow paint blaze on the pine-tree bark of the northwest corner had been scraped off. Also, the old fence and post had been removed, as had the yellow paint on the trees along the northern and western boundaries. Additional photographs and a video were taken of the alterations, and later entered into evidence and shown at trial. In November 2013, Allen hired his own surveyor, Donald Rowe, who completed his survey in December 2013.

¶10.    On December 23, 2013, ALR and MKAZ filed suit to quiet and confirm title against the Croniers and their granddaughter, asserting their claim to the disputed ten acres by adverse possession. They requested the court establish the property's boundary lines as set forth in the Moody survey, which was attached to their complaint.

¶11.    In July 2014, the Rainwaterses again visited the property and claimed the Croniers or their agents had erected new gates and barbed-wire fencing around the eighty acres, using the legal description in the warranty deed for the boundaries, not the old markers on the western side. Accordingly, the Rainwaterses amended their complaint against the Croniers to include trespass, compensatory and punitive damages, and attorney fees. The compensatory damages were for the cost of removing the new gates and fencing.

¶12.    Before trial, the court and counsel viewed the property firsthand. A two-day bench trial began in September 2015, and continued in January 2016. Surveyors Rowe and Moody provided expert testimony at trial.

5

¶13. Austin, in his seventies, testified that the property lines in the area were already determined by the Rainwaterses' family fifty or more years ago, and stated that, generally, none of the property sections in Roberts' Neck were exactly 640 acres. His family started buying property in this area of Jackson County in the 1940s. Sixty years ago there was a fence on the western boundary (the eastern boundary of the disputed area) of the Croniers' current property to keep cattle in that parcel. Portions of the fence, although dilapidated, still exist. Austin stated his father dug a firebreak that meandered along the western side of this fence, which had long been considered the eastern boundary of the Rainwaterses' property. Austin also testified that he helped his father harvest turpentine on the disputed area about sixty years ago. His father began performing controlled burns on the property approximately sixty-five years ago. In his youth, Austin always mistakenly assumed the area was his father's property. The road traversing the disputed area is the only access to the Rainwaterses' property lying south of the Croniers' property.[6] Austin explained the Rainwaterses have leased the property to a hunting club for many years, but the Rainwaterses have never lived on the property.

¶14. Austin testified that in 1987 his family hired "Mr. Dennis" to mark the boundaries of their property. He used yellow paint to blaze the trees along the boundaries, and kept a map showing the area of the blazes, which was entered into evidence. These blazes were found by both Moody and Moody Jr. along the northern property line. Austin claimed that he showed the old corner markings to Allen prior to Allen's purchase of the property. Further,

---

[6] Allen obstructed this road by building a gate after the litigation ensued.

6

Moody Jr. testified that Bang pointed out these old corner markers to Allen at the time of the purchase. Allen, however, denied these statements.

¶15. Marshall testified that his family had continuously utilized the property since at least 1947. He and his family visited the property at least a couple times a year. He testified the western firebreak was plowed sometime in the 1990s by his father. He corroborated Austin's testimony about the former yellow paint blazes on the trees, the corner markers that had been removed, and the old fence. Moody also testified to the markers' removal. He contended that Allen could have avoided this dispute by having a survey completed before he bought the property.

¶16. Rowe testified he saw no evidence of an old fence line, yellow painted blaze marks, or old corner monuments when he performed his survey in December 2013, over a year after the Moody survey. He described the property as "overgrown," and noted that the firebreaks did not correspond to property lines claimed by the parties. After Rowe marked the property boundaries described by legal description, Allen built a fence and gates around the perimeter, which included the disputed parcel.

¶17. Allen testified he initially heard about the property being for sale through hunting-club members. He and his wife went to examine the property with Bang and his wife in a golf cart. Bang showed him the corner boundaries, but Allen denied seeing a yellow-blazed tree, pipe, or corner markers on the western boundary. He did see old fence posts, but no fence.

¶18. Allen testified he felt "ambushed" during the August 2012 meeting when told by Moody the parcel he bought was not eighty acres. Allen denied he ever saw Moody's

7

preliminary or final survey. Allen also denied any knowledge of the old corner markings, even though Moody Jr. testified that when his company was originally hired by Allen for a survey, Allen had pointed out the old monuments and markings in the corners, as shown to Allen by Bang. Finally, Allen denied removing any boundary markings.

¶19. In March 2016, the chancellor entered her findings of fact and conclusions of law. The chancellor ruled in favor of the Rainwaterses on their claim of adverse possession on the west and north boundary of the Croniers' parcel, but against the Rainwaterses on its adverse-possession claim to a sliver of property along the southern boundary of the Croniers' parcel. The Croniers were ordered to remove all fencing and gates they had installed along the boundaries of the disputed parcel. The Croniers were also ordered to pay attorney fees for the Rainwaterses and court costs. In April 2016, a final judgment was entered, and Allen appealed.

## STANDARD OF REVIEW

¶20. This Court's review of a chancellor's decision is limited. "The chancellor's findings of fact will be accepted as long as the record reasonably supports those findings." *Rester v. Greenleaf Res. Inc.*, 198 So. 3d 472, 474 (¶5) (Miss. Ct. App. 2016) (citation and quotation marks omitted). This Court will not disturb the chancellor's findings "unless those findings are clearly erroneous or an erroneous legal standard was applied." *Cook v. Robinson*, 924 So. 2d 592, 594 (¶9) (Miss. Ct. App. 2006) (citation omitted). "The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony." *Id.*

8

**ANALYSIS**

¶21. Allen argues that the chancellor erred in finding the Rainwaterses proved adverse possession of the disputed 9.57 acres. He claims they failed to prove continuous use and activities on the property, or notification. He also argues the award of attorney fees is improper.

## I. Adverse Possession

¶22. Mississippi Code Annotated section 15-1-13(1) (Rev. 2012) provides:

> Ten (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title . . . .

In other words, adverse possession of real property for ten years perfects title in the possessor.[7] *Lynn v. Soterra Inc.*, 802 So. 2d 162, 166 (¶10) (Miss. Ct. App. 2001) (citing Miss. Code Ann. § 15-1-13). For a successful claim of adverse possession, the plaintiff must prove by clear and convincing evidence that the possession was: "(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *Wicker v. Harvey*, 937 So. 2d 983, 993 (¶32) (Miss. Ct. App. 2006) (quoting *Blackburn v. Wong*, 904 So. 2d 134, 136 (¶15) (Miss. 2004)). Ultimately, the question is whether the possessory acts of the claimant are sufficient to put the record title holder on notice that the property is "held under an adverse claim of ownership." *Rester*, 198 So. 3d at 475 (¶7) (citation omitted).

---

[7] Excepted are claims by minors or the mentally incompetent. Miss. Code Ann. § 15-1-13.

9

### A.     Under Claim of Ownership

¶23.   The adverse possessor must possess the subject property under a claim of ownership for a ten-year period.  Miss. Code Ann. § 15-1-13.  Allen argues that there was no testimony about a claim of ownership to the disputed area.  We disagree.

¶24.   The chancellor found several claims of ownership by the Rainwaterses were visible for over ten years.  The Rainwaterses testified that their family had used the property for approximately sixty years prior to the Croniers' purchase of the property.  In 1987, Mr. Dennis, employed by the Rainwaterses, marked the boundaries of the family land with yellow blazes on trees along the western property line.  Moody's survey corroborated these markings.  Allen's argument is without merit.

### B.     Actual and Hostile

¶25.   Actual possession is "effective control over a definite area of land, evidenced by things visible to the eye or perceptible to the senses."  *Wicker*, 937 So. 2d at 993-94 (¶34) (quoting *Blankinship v. Payton*, 605 So. 2d 817, 819-20 (Miss. 1992)).  "Adverse use is defined as such a use of the property as the owner . . . would exercise, disregarding the claims of others entirely, asking permission from no one, and using the property under a claim of right."  *Peagler v. Measlells*, 743 So. 2d 389, 391 (¶9) (Miss. Ct. App. 1999) (quoting *Cummins v. Dumas*, 147 Miss. 215, 113 So. 332, 334 (1927)).  In other words, the Rainwaterses must prove that the Croniers, or their predecessors, were aware of their occupation and took no action to prevent it. *See Double J Farmlands Inc. v. Paradise Baptist Church*, 999 So. 2d 826, 829 (¶15) (Miss. 2008).

10

¶26. Allen contends that the only testimony about visible use of the property is the Rainwaterses' harvesting turpentine decades ago and Mr. Dennis's flagging the property in 1987, which Allen claims are too "remote in time." The chancellor found, as in the first element, that the boundary markings were clear. Also, Allen had been told of them personally by Austin. Moreover, when Allen hired the Moodys to survey the land, Allen took Moody Jr. to the northwest and southwest corners of the property in dispute, where there were alternate boundary markers visible. This fact contradicts the dissent's allegation that the only evidence that established notice to Allen was Austin's testimony of the boundaries. Finally, Allen did not need to be aware of the occupation for the ten years; title ripened in the Rainwaterses when they completed ten years of adverse possession. Thus, the Rainwaterses' flagging of the property was not "too remote" in time. Allen's predecessors took no action to prevent the Rainwaterses' occupation. The evidence establishes this element.

### C. Open, Notorious, and Visible

¶27. Mere possession of the property is not sufficient; the possession must be open, notorious, and visible. *Wicker*, 937 So. 2d at 994 (¶35) (citing *Craft v. Thompson*, 405 So. 2d 128, 130 (Miss. 1981)). "[A]n adverse possessor 'must unfurl his flag on the land, and keep it flying, so that the (actual) owner may see, and if he will, that an enemy has invaded his domains, and planted the standard of conquest.'" *Blankinship*, 605 So. 2d at 820 (citation omitted). "[A]n important question is whether the claimant exercises the 'same character of control' that he would apply toward property that was actually his, and which he would not apply toward property that he did not own." *Wicker*, 937 So. 2d at 994 (¶37) (citations

omitted).

¶28.    Allen claims that there was no evidence of open, notorious, and visible possession of the property such that he or the predecessors-in-title would know of it. However, the chancellor found several instances of such possession. Photographs, survey plats, and testimony show the painted blazes existed on timber on the northern and western boundaries of the Croniers' property, until they were removed. Moody Jr. testified that Allen took him to the corners claimed by the Rainwaterses; Allen thought they were the corners of his property, until he learned of a discrepancy in the deed. Further, the Croniers' predecessors had honored these boundaries.

¶29.    Other possessive acts by the Rainwaterses over the years included marking corners, creating firebreaks, fencing borders, harvesting turpentine, leasing the property for hunting, and using the area's road to access other property. Additionally, the property was flagged by Mr. Dennis, controlled burns were performed, and cows grazed on the disputed property. We cannot accept the dissent's characterization of these activities as a few isolated events. The record shows that there was testimony, apparently accepted by the chancellor, that clearly established decades of open, obvious control of the disputed property. It was not the fact that there were remnants of "meandering" paint markings on trees or an old firebreak, but that this evidence supported the testimony of the Rainwaterses that this property had been in their family's possession for decades. The evidence is sufficient to establish this element.

### D.    Continuous and Uninterrupted for Ten Years

¶30.    Allen argues that the Rainwaterses failed to prove continual possession of the property

12

for ten or more years, instead providing only "instances of intrusion" on the property. Additionally, Allen claims this element was not met because many of the Rainwaterses' possessory acts occurred fifty to sixty years ago, which were again too "remote in time." However, the Rainwaterses do not need to prove continuous uninterrupted possession for more than ten years. Instead, title ripened after ten years of continuous uninterrupted possession, after which the former property owner would have to prove adverse possession in his own favor to regain title. *See Lynn*, 802 So. 2d at 166 (¶10).

¶31. The chancellor found clear and convincing evidence the Rainwaterses possessed the disputed ten-acre parcel for a continuous period in excess of ten years, and we agree. The last time the painted boundary blazes on the trees were maintained was 1987, well over ten years ago. As stated above, the Rainwaterses have continuously used the western portion of the property to access other property they have owned since the 1940s, visiting the property a couple of times a year. Furthermore, there is no limit regarding remoteness of time; the continuous and uninterrupted use of the property over a period of ten or more years meets the statutory requirements.

### E. Exclusive

¶32. Exclusive possession is "an intention to possess and hold land to the exclusion of, and in opposition to, the claims of all others, and the claimant's conduct must afford an unequivocal indication that he is exercising dominion of a sole owner." *Wicker*, 937 So. 2d at 995 (¶40) (quoting *Rawls v. Parker*, 602 So. 2d 1164, 1169 (Miss. 1992)). Allen argues the Rainwaterses did not offer evidence as to the actual property lines at issue. He claims the

rural property was overgrown; thus, the actual corners were difficult, if not impossible, to ascertain.

¶33. The chancellor found the Rainwaterses had exhibited actions showing dominion and control over the property at issue for decades, and we cannot say she erred. Testimony showed the Rainwaterses had maintained and marked the boundaries of the property since the 1940s by fences, yellow blazes, and firebreaks. Additionally, Austin testified that before Allen bought the property, he told Allen about the corner markers and boundaries. These markers were still visible when Moody performed the first survey, and were, in fact, pointed out by Allen, according to Moody. Allen's argument is without merit.

### F. Peaceful

¶34. Allen states the record is silent concerning peaceful use of the land before his ownership, but since then, he claims it has not been peaceful as he has built a fence on the property-description lines, which includes the disputed property, and added a gate to obstruct the road that leads to the Rainwaterses' other property. However, the chancellor found the testimony showed that the Rainwaterses peacefully used and possessed the disputed property for decades. Further, the Rainwaterses and Bang were peaceful neighbors for over ten years. It was only when Allen purchased the property that a boundary dispute ensued. We find the chancellor's findings proper.

## II. Attorney Fees

¶35. The chancellor ordered the Croniers to pay the Rainwaterses' attorney fees and court costs because the "actions of Allen in erecting a fence around the property were in clear

disregard of the Rainwaterses' rights." Additionally, the chancellor stated that Allen "knew at the time he built the fence and conveyed the property to his minor granddaughter that there was a serious claim" to the disputed parcel.

¶36. At trial, the Rainwaterses submitted a statement for attorney fees of $9,790.05, not including ten hours spent at trial. The chancellor added ten hours of fees to this figure, but deducted five hours, because she did not find in favor of the Rainwaterses' adverse-possession claim for the southern portion of the property. Therefore, a total of $10,790.05 in attorney fees was awarded to the Rainwaterses.

¶37. Allen argues that attorney fees are not allowed in the absence of contractual provisions, statutory authority, or an award of punitive damages.

¶38. Mississippi follows the American rule for awards of attorney fees. "[A]bsent some statutory authority or contractual provision, attorneys' fees cannot be awarded unless punitive damages are also proper." *Fulton v. Miss. Farm Bureau Cas. Ins.*, 105 So. 3d 284, 287-88 (¶16) (Miss. 2012). Punitive damages are only proper when the plaintiff shows by clear and convincing evidence the defendant acted with actual malice. Miss. Code Ann. § 11-1-65 (Rev. 2014). "[T]he plaintiff must demonstrate a willful or malicious wrong, or the gross, reckless disregard for the rights of others." *Wise v. Valley Bank*, 861 So. 2d 1029, 1034 (¶15) (Miss. 2003).

¶39. Here, while there is no contractual provision, statutory authority, or specific award of punitive damages, the chancellor awarded attorney fees for the same reason the Rainwaterses requested punitive damages in their amended complaint (for the "Defendants' reckless

disregard of the Plaintiffs' rights in this case"). The Mississippi Supreme Court has held that attorney fees may be awarded instead of punitive damages. *Pursue Energy Corp. v. Abernathy*, 77 So. 3d 1094, 1102 (¶26) (Miss. 2011) (citing *Aqua-Culture Tech. Ltd. v. Holly*, 677 So. 2d 171, 184 (Miss. 1996)). Here, the chancellor did not specify in her order that she was awarding attorney fees in lieu of punitive damages. However, as the trier of fact she could have found Allen acted with actual malice in removing boundary markers, and constructing gates and a fence. Accordingly, we reverse and remand for clarification of whether punitive damages were awarded in the form of attorney fees.

¶40. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. TINDELL, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**TINDELL, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶41. While I concur with the majority opinion as it pertains to the award of attorney fees, on the issue of adverse possession, I must respectfully dissent. "Clear and convincing" is a high order of proof that requires even more proof than "overwhelming weight of the evidence." *Bailey v. Woodcock (In re C.B.)*, 574 So. 2d 1369, 1375 (Miss. 1990). To prevail upon an adverse-possession claim, one must prove each of its six required elements by this extraordinarily high standard of proof. *West v. Brewer*, 579 So. 2d 1261, 1262 (Miss. 1991). Here, the record lacks the indispensable, clear and convincing proof necessary for the Rainwaterses to prevail on their adverse-possession claim of the disputed property. To find otherwise, in my opinion, is manifestly wrong.

¶42.    "The ultimate question is whether the possessory acts relied upon by the would[-]be

adverse possessor are sufficient enough to place the record title holder on notice that the

lands are under an adverse claim of ownership." *Stringer v. Robinson*, 760 So. 2d 6, 10 (¶13)

(Miss. Ct. App. 1999).   The Rainwaterses' possessory acts, as testified to by Austin,

consisted of his father harvesting turpentine on the disputed parcel in the 1950s, hiring

someone to mark their boundaries with yellow paint in 1987, and leasing the disputed land

to a hunting club.   However, there was no evidence as to exactly how many years the

turpentine was harvested, if the record title holder was ever made aware of the yellow blaze

(and even if he was aware of the yellow blaze, did he know it was there to identify a

boundary), and if the hunting club ever actually hunted on the disputed property.  The only

evidence that establishes notice to the record title holder is Austin's testimony that he told

Allen about the purported boundary lines within the last ten years.  These acts simply are not

enough to meet the clear and convincing standard required to establish actual and hostile

possession by the Rainwaterses of the disputed property.[8]

¶43.    An adverse possessor must "fly his flag over the lands" of the documented owner.

*O'Neal v. Blalock*, 220 So. 3d 234, 240 (¶14) (Miss. Ct. App. 2017); *Hill v. Johnson,* 27 So.

3d 426, 431 (¶19) (Miss. Ct. App. 2009).  Mississippi caselaw has repeatedly recognized that

the mere presence of a fence, without more, has never been sufficient to sustain a claim of

adverse possession.  *See Double J Farmlands Inc. v. Paradise Baptist Church*, 999 So. 2d

---

[8] Austin testified that they routinely used a road on the disputed property to access the adjoining property.  Even if this Court were to reverse the chancellor's finding of adverse possession, the Rainwaterses could pursue a claim for a prescriptive easement as to the road.

826, 829 (¶15) (Miss. 2008); *Davis v. Clement*, 468 So. 2d 58, 63 (Miss. 1985); *Harmon v. Buckwalter*, 233 Miss. 761, 763-66, 102 So. 2d 895, 896-98 (1958); *Snowden & McSweeny Co. v. Hanley*, 195 Miss. 682, 686-88, 16 So. 2d 24, 25-26 (1943). Here, the Rainwaterses do not even have a fence. Instead, they assert the boundaries were established by the following: a single tree blazed with some yellow paint and three-fourth-inch pipe at one purported corner; some painted markings "meandering" along the ground in an overgrown section of the property that purported to be the property line; a single fence post in another purported corner; and an old fire lane meandering through another overgrown area along the other purported property line.[9] To give weight to the aforementioned evidence over the clear wording of a deed's legal description would be a giant step away from the "clear and convincing" standard and the "open, notorious, and visible" element required in adverse-possession caselaw.

¶44.    To illustrate the evidence needed, an adequate showing of adverse possession was made in *Scott v. Anderson-Tully Co.*, 154 So. 3d 910, 916 (¶16) (Miss. Ct. App. 2015), where the would-be adverse possessor "distinctly" painted the borders and wire fence of a disputed property. The supporting evidence in *Scott* was stronger than in this case and included the following: the fence line was repeatedly painted and was done in such a manner that it was easily recognizable; testimony was presented that the community itself recognized the property line; the timber (not just sap from the tree) had been harvested on at least three

---

[9] Austin also testified that his father had done some controlled burns on the disputed property and that cows had grazed there. If the area was unfenced, as Austin testified, it is to be expected that such activities would spread across the legal property boundaries.

18

occasions; and hunting leases were issued five separate times on the disputed property (and the record contained written copies of the contracts with plats attached that included the disputed property). *Id.* Further, the evidence in *Scott* showed the would-be adverse possessor constantly worked and maintained the land. By contrast, the Rainwaterses admitted the area in dispute here had become overgrown and that they only visited the property a couple times a year. Clearly, *Scott* is distinguishable from this case.

¶45. I am keenly aware that "[t]he credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *Polk v. Polk*, 559 So. 2d 1048, 1049 (Miss. 1990) (quoting *Rainey v. Rainey*, 205 So. 2d 514, 515 (Miss. 1967)). Furthermore, it is of the utmost import that this Court be bound by the "severely limited substantial[-]evidence/manifest[-]error standard of review." *Stallings v. Bailey*, 558 So. 2d 858, 861 (Miss. 1990) (citing *Savage v. Parrish*, 488 So. 2d 1342, 1342 (Miss. 1986); *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985)). However, I believe we are equally required to not erode the extraordinarily high "clear and convincing" standard of proof necessary to take the property of another through adverse possession. If the chancellor's decision is affirmed, I believe such an erosion will occur. I therefore must respectfully dissent from that portion of the majority's opinion that affirms the chancellor's finding of adverse possession.