BROADUS, et al. *v.* HICKMAN.

Division B. Feb. 12, 1951.

No. 37792 (50 So. (2d) 717)

English Lindsey, for appellants.

Ross & Butts, for appellee.

Roberds, P. J.

This suit involves the title to sixty acres of land. Hickman filed the bill herein to establish his title thereto and remove as a cloud thereon all claims of defendants. He made defendants to the bill former owners and heirs of deceased owners, the State of Mississippi and Mr. and Mrs. J. T. Broadus. The contest was between Hickman and the Broaduses. The chancellor established title in Hickman and the Broaduses appeal.

Hickman claimed as grantee in a quitclaim deed dated June 21, 1946, executed by D. B. Allen, the owner of the land when it sold to the State of Mississippi August 31, 1931, for nonpayment of taxes for the year 1930.

Mr. and Mrs. Broadus assert title as patentees from the State under patents issued in December 1940, and also by adverse possession under Section 717, Miss. Code 1942, known as the two-year limitation statute under state patents.

As to the validity of the tax sales to the State, Allen was assessed with and owned during the years 1930 and 1931 the SW¼ of the NW¼ and the NW¼ of the SW¼ and the N½ of the SW¼ of the SW¼ of Section 19,

Township 7, Range 2 in Harrison County, Mississippi. It is seen the three parcels adjoin and constitute one tract. They were assessed separately. The chancellor found, and the proof amply sustains the finding, that there were three separate and distinct sales, one sale of each parcel, and the land was never offered for sale as constituting one tract, as required by Section 3249, Miss. Code 1930. He, therefore, held the sale to the State conveyed no title. In this he was correct as the statute then read. Section 3249, supra; Leavenworth v. Claughton, 197 Miss. 606, 19 So. (2d) 815, 20 So. (2d) 821.

The real contest here is whether Mr. and Mrs. Broadus have shown such claim to and acts of ownership over the land in question as to vest in them title thereto and bar the suit of Hickman against them under Section 717, Miss. Code 1942. That is to be tested by the facts shown by the land records and those established outside those records.

These are the facts shown by the land records:

On August 31, 1931, the lands were assessed to Allen and were sold to the State.

In December 1940, the State issued a patent to Mrs. Broadus to the twenty acres above described, being the south twenty acres of the entire tract, and it then issued a patent to Mr. Broadus to the forty acres just north of the twenty acres.

In January 1946, Hickman applied for a patent to this land and the forty immediately north thereof. He was informed the Governor was not signing land patents at that time and if and when the policy was changed he would be notified.

On June 21, 1946, Allen executed his deed to Hickman conveying not only the sixty acres here in controversy but also the forty acres just north of the Broadus sixty acres. This was a quitclaim deed, for which $100 was paid, and it was executed by Allen in the State of Florida.

On June 22, 1946, the Broadus patents were placed of record.

The land was assessed for taxes to the Broaduses for the years 1941 to 1946 and they paid the taxes thereon. The bill was filed in this cause August 16, 1946.

Now, as to the facts other than those shown by the land records:

Apparently after the lands sold to the State, Allen exercised no further acts of ownership thereover. He seems to have gone to the State of Florida, where his deed to Hickman was executed.

The Broaduses promptly had the lands assessed to themselves. They lived about five miles from the land and they visited it and went over it from time to time. In November 1941, they had the land surveyed. The surveyor established the lines and corners thereof. Stakes were placed at the six corners and blazes were made at least along some of the lines.

In April 1942, the Broaduses executed a turpentine lease on the property for a period of three years. The lessee went upon the property with laborers and "faced" some 500 pine trees. This consisted of ". . . peeling the bark off and cutting into the wood. Flattened a place on the butt of the tree." Again, "cleaning the bark and flattening out a place to insert the aprons in the tree to turn the gum into the cups." These barked places on the trees were about ten inches above the ground and extended three inches upward. He and his workmen were on the land a number of times. Because of scarcity of labor due to war conditions, he did not follow up by placing the turpentine cups upon the trees. These tree facings were obvious to one walking over the land unless grass had grown sufficiently high to obscure them. The lessee understood Mr. and Mrs. Broadus owned the land. The lease was not placed of record, as was the practice of this particular lessee. One witness said he saw the blazed places on the trees made under the turpentine lease and had it been his land he would have made inquiry as to who placed them there. Mr.

Broadus was seen upon the land a number of times and those seeing him presumed he owned the land. Beginning right after the patents were issued and continuing to the time of the trial Mr. Broadus, each year, went upon the land, with others hired by him, and burned what are called fire guards along, or near, the south and east lines of the land to prevent fire getting onto it. He engaged Mr. W. E. Cunningham to help in the work and that was done each year for some five years. Witnesses saw Broadus doing that. The fire guards did not extend entirely around the land for the reason some of it was in what the witnesses called a "swamp", and there was little, or no, danger of fire to that part of the property. In addition to this, the Broaduses transplanted upon this land a great many young trees and made such preparation thereon as was required by good reforestation. Mr. Broadus was interested in reforestation and the property was bought from the State for that purpose. As stated, Mr. Broadus was upon the land, engaged in the foregoing activities, several times each year. The land was not fenced. Mr. Broadus explained he did not fence it because few hogs ran wild in that part of the country, (rooting hogs seeming to be very detrimental to young pine trees), and since he and his wife purchased the land for reforestation, there was no need to fence it. He constructed no houses thereon not needing them. The pertinent fact should be added that this is what is known as "wild land." A large part of it was in the "swamp" and one witness testified the upper land was not good for cultivation; that it had too much gravel in it. In other words, the land was really suited only to the purpose for which is was used by the Broaduses, that of reforestation, which purpose did not necessitate performance thereon of any acts of ownership other than those exercised by the Broaduses. The chancellor himself found the facts essentially as we have set them out. Indeed, he found the Broaduses had spent in taxes, fire

protection, reforestation, etc., the sum of $233.64, not counting the time and labor of Mr. Broadus.

The question is are those facts sufficient, as applied to the nature of the land here in controversy, to establish title in the Broaduses and prevent recovery thereof by Hickman under said Section 717? This Court has held that ██ the necessary facts to acquire title by adverse possession and preclude recovery by another against such adverse claimant are the same under said Section 717, the two-year tax statute, as under Section 711, Code 1942, the ten year statute. Smith v. Myrick, 201 Miss. 647, 29 So. (2d) 924. Again, it is the rule that ██ less notorious and obvious acts upon the land are essential to vest title in what are known as wild lands than lands suitable to occupancy by residing thereon and putting them to husbandry and farming. McCaughn v. Young, 85 Miss. 277, 37 So. 839, 842. The facts in no two cases are exactly the same. Each much stand upon its own facts; therefore, we deem it unnecessary to detail the various facts involved in the many cases in this State which have involved this question. We think the question solvable by testing the facts of this case by the rule laid down in the McCaughn case, supra. The rule was there stated in these words: "The true doctrine, and the one now generally recognized, is thus stated by Harris, J., in Ford v. Wilson, 35 Miss. 490, 72 Am. Dec. 137: 'That ██ neither actual occupation, cultivation, or residence are necessary to constitute actual possession when the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim.' Worthley v. Burbanks, 146 Ind. 534, 45 N. E. 779; Hubbard v. Kiddo, 87 Ill. 578; 3 Washburn on Real Property, Sec. 1965. 'It is not necessary that the occupation should be such that a

mere stranger passing the land would know that some one was asserting title to a dominion over it. It is not necessary that the land be cleared or fenced, or that any building be put upon it. The possession of land cannot be more than the exercise of exclusive dominion over it.' 2 Wood on Limitations, Sec. 267.'' Did Broadus exercise over this property ''. . . public acts of ownership, such as he would exercise over property which he claimed in his own right and would not exercise over property which he did not claim?'' We think so. █ Here he took possession; went upon the property; paid taxes for five years; gave a turpentine lease, under which visible acts upon the trees were performed by the lessee; from year to year burned fire guards; had the property surveyed, the corners established and marked, grazed some trees along the survey; transplanted many trees; did other acts as above enumerated, and actually paid out to others in taxes and in improving and protecting the property, not counting his own time and labor, $233.64. The land could not be profitably cultivated, nor was it good pasture land, or suitable for occupancy as a residence much of it being swampy and low. It was by nature best adapted to the use to which Broadus put it, i.e., reforestation. It is evident, too, that any person of ordinary observation, going upon and inspecting the land as a prospective purchaser, would have noticed signs of ownership being exercised thereover. Noticing these, slight inquiry would have brought home to Hickman the knowledge Mr. and Mrs. Broadus were claiming and occupying the land when he got his quitclaim deed from Allen June 21, 1946, paying therefor one dollar an acre. We think these facts comply with the rule. This is not a reversal of the chancellor upon the facts. As stated, he found them essentially as we have detailed them. It is simply an application of the rule to the facts.

Reversed and judgment here for appellants.