George T. HOUSTON, III and Ruth H. Jarvis Baker, Plaintiffs-Appellants,

v.

UNITED STATES GYPSUM COMPANY, a corporation, Defendant-Appellee.

No. 76-2988.

United States Court of Appeals, Fifth Circuit.

March 16, 1978.

Frank E. Everett, Jr., Robert A. Weems, Vicksburg, Miss., for plaintiffs-appellants.

J. A. Lake, Greenville, Miss., for defendant-appellee.

Before COLEMAN and FAY, Circuit Judges, and KING,* District Judge.

COLEMAN, Circuit Judge.

What happens when an unstoppable force collides with an immovable object? In this case the unstoppable force is the never ending, often shifting, accretive processes of the Mississippi River. The immovable object is the boundary line of privately owned land in the bed of the river.[1] After an extended Bench trial, which accumulated a voluminous record, judgment went for the owner of the river bed. This appeal followed. We affirm the Judgment of the District Court as to the riparian ownership of the tract in dispute. We vacate the remand on the issue of adverse possession.

The facts are not in dispute. The parties agree that the common law of Mississippi governs the outcome. The question is, what does the common law of Mississippi require in such a situation?

We begin with "Stack Island" in the Mississippi River, so identified in the original 1826 United States Land Survey (platted as "Island No. 94" by the government in 1881). The government patented the island to a private purchaser in 1888. As successors in the chain of title, the Houstons have owned the island since 1934. The island, and the accretions at issue, are on the west side of the main river channel, across the channel from the dry land owned by Gypsum on the east bank. Consequently, the island and its accretions do not interfere with Gypsum's access to the main channel.

Since 1950 Gypsum has owned a tract of land in Issaquena County on the east bank of, and riparian to, the main channel. The 1950 conveyance to Gypsum included "all accretions and batture lands adjoining or any way connected with above described land . . . and any islands located between the above described lands [and] the Louisiana-Mississippi state line".[2]

Gypsum lays no claim to Stack Island accretions situated north of its boundary line as extended from the river bank westerly across the river to the middle or thread of the stream of the *old* river. Gypsum says, however, that when the Stack Island accretions advanced downriver and crossed that north (extended) line, the dry land thereafter accreting became its property.

It is shown by the evidence that over a period of many years, particularly from

* District Judge of the Southern District of Florida, sitting by designation.

1. "In Mississippi the common law prevails as to riparian rights, and he who owns the bank owns to the middle of a navigable river subject to the easement of navigation", *Archer v. Greenville Sand and Gravel Co.*, 233 U.S. 60, 34 S.Ct. 567, 58 L.Ed. 850 (1914).

2. The state boundary between Louisiana and Mississippi north of the thirty first degree of north latitude is the "middle or thread of the stream of the Mississippi River", Mississippi Constitution of 1890, Art. 2, Section 3. This description traces its origin to the Treaty between Great Britain, France and Spain, February 10, 1763. See detailed history in the Mississippi Code of 1857, page 46, *et seq.* An avulsion does not change the boundary. Hence, all the territory involved in this controversy is in Issaquena County, Mississippi, even though Stack Island is now west of the main channel of the Mississippi River.

1913 to 1925, the Mississippi River by its meanderings and avulsive actions developed the following situation:

(a) The Louisiana-Mississippi state line became permanently fixed west of Stack Island near the Louisiana shore along the line described in the Bill of Complaint as shown by various exhibits to the testimony of Mr. Austin Smith, river expert;

(b) All lands which had formerly once developed as accretions southward from Stack Island before 1925, and all remnants of any accretions from the Mississippi mainland west of the navigation channel prior to 1925 were wiped out and washed away by the river in a gradual process of erosion;

(c) After 1913, the main channel of the River has constantly remained east of Stack Island (and its downstream extensions), that is, between Stack Island as extended and the Mississippi mainland shore;

(d) After 1925, Stack Island *proper*, which remained intact, began a completely new process of building up southward, downstream, on the west side of the main channel which separated the island and its lengthwise accretions from the Mississippi riparian mainland;

(e) The southward growth of Stack Island west of the main channel continued downstream considerably beyond the westward extension of the north line of the Gypsum property on the Mississippi shore;

(f) No part of Stack Island as extended after 1925 formed between the main channel and the Mississippi riparian shore. Its total growth as now constituted is southward from the island and on the west side of the main channel;

(g) By 1950, Stack Island had grown southward downstream west of the main channel so as to include virtually all of the land here in controversy;

(h) The identity and unity of Stack Island as extended has been officially recognized and maintained by U. S. Government navigation and hydrographic maps designating the entire growth as Stack Island;

(i) The downriver extension of Stack Island west of the navigation channel has not blocked or excluded Gypsum or any other riparian owner on the Mississippi shore (east bank) from access to the river channel;

(j) Gypsum lands have riparian access to the river channel for the entire length of the Gypsum property.

The respective rights of adjacent riparian owners have collided.

The Houstons contend that they own the Stack Island accretions, regardless of how far south they may run, so long as they do not cross into the territory of another sovereignty.

Gypsum responds that when the accretions [3] crossed its northern boundary, as extended westerly from the east bank, the dry land so created passed out of the ownership of the Houstons and became its property. The District Court agreed.

### *The Applicable Law*

It has been held that "The right of accretion to an Island in the river cannot be extended lengthwise of the river as to exclude riparian properties above or below such island from access to the river", *City of St. Louis v. Rutz*, 138 U.S. 226, 11 S.Ct. 337, 34 L.Ed. 941 (1891). In the present case, however, the downstream accretions to Stack Island do not affect Gypsum's access to the main channel of the Mississippi.

In *City of St. Louis v. Rutz, supra*, it was further held:

> It is laid down by all the authorities, that, if an island or dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor, the same is the property of such riparian proprietor. He retains the title to the land previously owned by him with the new deposits thereon.

3. "[A]ccretion denotes the process of increasing real estate by gradual and imperceptible deposition, through the operation of natural causes, to that already in the possession of the owner", *Humble Oil & Refining Company v. Sun Oil Company*, 5 Cir. 1951, 190 F.2d 191, 196.

138 U.S. at 245, 11 S.Ct. at 344. In the Fifth Circuit, in a Texas case, it has been said that "[I]f an island arises in navigable inland waters . . . it belongs to the owner of the bed of the water", *Humble Oil and Refining Co. v. Sun Oil Co.*, 5 Cir. 1951, 190 F.2d 191, 196.[4]

Compared to the present litigation these cases are not factually squarely in point because we are not dealing with an island recently formed but with the accretions to an island which has been there all the time. We think, however, that we should not minimize the significance of the *Rutz* language to the effect that if "dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor . . . he retains title to the land previously owned by him *with the deposits thereon* (emphasis added)". We are hard put to think of a good reason for supposing that as to deposits on one's land there should be one rule for newly formed islands in the river and accretive deposits left by the river.

A survey of the precedents existing in common law jurisdictions in this country fails to uncover any case in which it has been held that island accretions belong to the island owner, regardless of how far those accretions may run within the same jurisdiction, or regardless of the deposit of those accretions on a stream bed belonging to someone other than the island owner.

On the other hand there is a considerable body of cases in which it has been held that title to an accretion originally formed on the property of one owner does not cover that accretion after it has extended to and over the property of another.

We do not linger to discuss the cases dealing with the apportionment of such deposits but note that, in our opinion, the Mississippi Supreme Court, although dealing with accretions to the river bank rather than an island, has nonetheless accepted the rule that one riparian owner may not follow his accretions after they encroach upon the lands of another, *Smith v. Leavenworth*, 101 Miss. 238, 57 So. 803 (1911).

In that case the Mississippi River accretions originated on the lands of Smith and thereafter moved over onto the property of Leavenworth. The Court held: "The fact that the alluvion began forming north of section 24 and opposite the land of appellant is immaterial. When it reached appellee's shore line in its southward progress, he became entitled to his portion thereof", 57 So. at 805. It may be that this result was dictated by the general rule that one man's accretion may not be allowed to cut off the access of the adjacent riparian landowner to the stream, but this aspect of such cases was not mentioned in the opinion and was not assigned as the basis for the holding. In any event, the case demonstrates that the owner of the original accretion may not invariably and absolutely follow it as his own after it crosses on to the lands of another.

Upon a most exhaustive study of this appeal we have come to the conclusion that its outcome is controlled by the decision of the Supreme Court of Mississippi in *Archer v. So. Ry. Co. in Mississippi*, 114 Miss. 403, 75 So. 251 (1917).

Mrs. Archer was the owner of lands situated on the east bank of the Mississippi River. An island had formed in the river opposite and west of her land and east of the thread of the stream. By accretions the island had gradually extended up the river until its northernmost point was in front of the lands of the Southern Railway Company, which lay north of and adjoining Mrs. Archer's lands on the river bank. Mrs. Archer claimed that when the island formed offshore in front of her land it became her property, that all accretions thereafter formed upon the island were a part of the island and therefore her property, although the accretions to the island had advanced beyond the boundary of the railway lands, extended from the bank to the thread of the stream.

4. The author of the opinion was Circuit Judge Edwin R. Holmes, of Mississippi, the state in which the lands now in controversy are located. Judge Holmes was from Yazoo City, on the banks of the Yazoo, a tributary of the Mississippi.

As a matter of "sound principle" and "common justice", the Mississippi Supreme Court endorsed the rule:

> However such accretions may be commenced or continued, the right of one owner of uplands to follow and appropriate them ceases when the formation passes laterally the line of his coterminous neighbor.

The Court added that "if an owner can claim an island after it has passed the line of his neighbor many complications as to riparian rights would inevitably arise".

The Court concluded as follows, 114 Miss. at 414, 75 So. at 252:

> As we have said before, there is a singular absence of authority on the precise question involved in this case. Much learning has been displayed by our own court, in the early cases, upon the subject of accretions and riparian rights; but we have searched in vain for a case just like the present case. The industry and ability of counsel has not produced a case in point, and so far as we know we are blazing the way in this decision. There must be some limit of the ownership of islands formed offshore in non-navigable rivers, and, when we fix the limit at the line of the coterminous owner, we feel that we are not out of line with the authorities, and safe within the boundaries of the general principles of convenience, justice, and common rights of property.

The key words were, "there must be some limit of the ownership of islands formed offshore in non-navigable rivers and . . we fix the limit at the line of the coterminous owner".

We recognize that the *Archer* case, *supra*, differs from ours in four particulars: (1) the Houstons and Gypsum were not coterminous owners on the east bank, as had been true of Mrs. Archer and Southern; (2) the island as originally owned by the Houstons was an independent entity, sold as such by the government in 1888, and its ownership did not arise by riparian connection to the river bank; (3) the accretions to Stack Island were downstream rather than upstream; (4) Stack Island was on the opposite side of the main channel, whereas the *Archer* island was between the lands of the Southern Railway Company and the thread of the stream. After considerable effort we have been unable to see that these differences would alter the outcome of the case.[5]

The crucial question is, what is to be done with island accretions which advance across the boundary of a coterminous riparian owner, who owns the bed of the river upon which those accretions have come to rest?

Looking at the fundamental aspects of the case, rather than allowing it to be controlled by tangential factors, we think the situation here is not so materially different to that in *Archer* that the Mississippi Supreme Court would modify the *Archer* rule that there must be some limit to the ownership of islands formed offshore in non-navigable rivers [6] *and that limit is to be found at the time of the coterminous owner.*

That being so, we find no warrant for holding that the District Court erroneously decided this issue. To the contrary, it would appear that on the only available Mississippi precedents he decided it correctly.

### *Adverse Possession*

The Houstons contend that even if title to the accretions at issue was in Gypsum, they nonetheless are the true owners of the land by adverse possession, Section 15–1–13, Mississippi Code of 1972.[7]

5. If Mississippi had a certification statute similar to four other states in this Circuit we most assuredly would have certified this issue to the Supreme Court of Mississippi.

6. The Mississippi is classified as a non-navigable river above the ebb and flow of the tide, but is, of course, navigable in fact. See *Culley v. Pearl River Ind. Comm.*, 234 Miss. 788, 108 So.2d 390 (1959).

7. § 15–1–13. Ten years' adverse possession gives title.

Ten years' actual adverse possession by any person claiming to be the owner for that time

The peculiar facts of each individual case determine whether there have been acts sufficient to acquire title by adverse possession, *Broadus v. Hickman*, 210 Miss. 885, 50 So.2d 717 (1951).

The Houstons had the burden of proving their adverse possession by a preponderance of the evidence, *Heidelberg v. Duckworth*, 206 Miss. 388, 40 So.2d 179 (1949).

The District Court found and held that the Houston burden had not been met. He did find that these were "wild lands" in the wildest sense of the term, and evinced an understanding of the Mississippi rule that the proof required to establish adverse possession of wild land is governed by more relaxed standards than those required for inhabited or cultivated lands.

The Mississippi jurisprudence on this specific subject begins with *McCaughn v. Young*, 85 Miss. 277, 37 So. 839 (1905). In *McCaughn* the lands were wild, lying in the midst of a vast area of swamp woodland, not susceptible to occupancy, improvement, or cultivation. The *McCaughn* Court laid down the following principles:

> "The true doctrine, and the one now generally recognized is 'That neither actual occupation, cultivation, or residence are necessary to constitute actual possession when the property is so situated as not to admit of any permanent useful improvement' . . . .;
>
> "It is not necessary that the occupation should be such that a mere stranger passing the land would know that someone was asserting title to a dominion over it. It is not necessary that the land be cleared or fenced, or that any building be put upon it.
>
> "The question is, Did the person claiming to hold adversely exercise towards the property the same character of control which he used towards property actually his, and which he would not have used over property which did not belong to him;
>
> "Possession of land cannot be more than the exercise of dominion over it."

The teachings of *McCaughn* were reaffirmed in *Broadus v. Hickman*, *supra*, decided in 1951, in which it was said:

> "[L]ess notorious and obvious acts upon the land are essential to vest title in what are known as wild lands than lands suitable to occupancy by residing thereon and putting them to husbandry and farming. . . . ." 50 So.2d at 717.

The *Broadus* Court, reversing the Chancellor who had held against adverse possession, asked: "Did Broadus exercise over this property '* * * public acts of ownership, such as he would exercise over property which he claimed in his own right and would not exercise over property which he did not claim'?" 50 So.2d at 720.

The question was answered in the affirmative because Broadus (1) took possession, (2) went upon the property, (3) paid taxes, (4) gave a turpentine lease [unrecorded] and some of the trees were cupped for production, (5) burned fire lanes, and (6) had the property surveyed and corners established, blazing some trees along the survey. The land was by nature best adapted to the use to which Broadus put it. Anyone going on the land would have noticed signs of ownership. Slight inquiry would have brought home to Hickman the knowledge that Broadus was claiming and occupying the land. The Supreme Court said that it was not reversing the Chancellor on the facts,[8] it was reversing on the application of the rule to the facts.

of any land, uninterruptedly continued for ten years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title, saving to persons under the disability of minority or unsoundness of mind the right to sue within ten years after the removal of such disability, as provided in section 15–1–7. However, the saving in favor of persons under disability of unsoundness of mind shall never extend longer than thirty-one years.

8. In Mississippi, the Chancellor's findings of fact may not be reversed unless "manifestly wrong", but he must apply the correct legal standards to an evaluation of the result dictated by the facts.

In his memorandum opinion rejecting Houston's claim of adverse possession the highly experienced District Judge made no reference to *McCaughn* and *Broadus.* He relied on the following facts:

1. No part of the island was ever effectively fenced;
2. The Houstons executed hunting leases on the property for many years;
3. Houston had his lessees post large notices to the public not to trespass on the property and placed these large signs at important places on the property;
4. Gypsum had no actual notice of Houston's claim to the property until 1957, at which time Gypsum told Houston that the property was theirs;
5. The Houstons testified that they put notices in the nearby Lake Providence, Louisiana, papers of their claim of ownership, but the actual notices were not produced in evidence;
6. The Houstons' lessee planted about fifteen acres of wheat on the property for deer;
7. Houston's proof fell far short of discharging their burden of proving possession of any definite or identifiable part of the land;
8. The actions on which the claimant of wild lands depends must *effectively* put the title owner out of possession.[9]

We have read the entire transcript of the evidence offered on behalf of the plaintiffs and the defendants in this case.

The transcript reveals the following facts not referred to by the District Court in its memorandum opinion:

In 1954 the Houstons gave an oil and gas lease on Stack Island to the California Oil Company, calling for 3300 acres of land. The Houstons had never marketed any timber from the land, but they had set out seedlings on the south end of the Island, which the river washed away.

As to any possession exercised by Gypsum, its employee, Obye, was on the disputed tract in 1953, when he made an observation by hand compass of its relationship to the Gypsum lands across the main channel on the east bank of the river. He left no sign of his visit because there was nothing to affix it to but sand, which the river would wash away.

Another representative of Gypsum went on the disputed property in 1957, 1963, and 1971. He put up no posted signs, and it was not until February 9, 1972, that the Gypsum north line was flagged and posted. As the District Court noted, there was much evidence of grazing in 1963 but no cattle were seen. The representative saw the wheat field and "a fence" on the property on December 9, 1971. Gypsum cut and sold about two barge loads of pulpwood off the disputed property in 1972.

On the record as it presently exists it would appear that Gypsum was probably entitled to no possessory *presumption* prior to 1972. It had simply visited the property and looked at it, but exercised no possessory control over it other than it, too, had issued hunting leases, with no further elaboration on what that entailed.

█ Of course, the Houstons, having the burden of establishing adverse possession, must win, if they are to win at all, on the strength of their own possession rather than the weakness of Gypsum's possession.

All this boils down to the inescapable fact that the adverse possession issue was just about as close as it could be. The District Court gave no indication that he had evaluated the facts according to the standards

9. "One whose land has placed upon it by another (without the consent of the owner) a 'brushed out' line, and posted signs at road entrances, and whose land is grazed annually by cattle of such adverse claimant, should take some appropriate action to stop the running of the ten year adverse possession statute", *Kayser v. Dixon,* 309 So.2d 526 (Miss., 1975).

The *Kayser* Court noted that "About the only thing [the unsuccessful] appellant did upon the land during the ten year period (other than occasionally walking on it) was to paint a so-called line which he considered to be the true line".

enunciated in *McCaughn* and *Broadus*, some of which would appear to preponderate in favor of the Houstons.

In sum, we are unwilling, as the Supreme Court of Mississippi did in *Broadus*, to reverse the District Court and direct that judgment be entered for the Houstons. On the other hand, for lack of a decision explicated under *McCaughn* and *Broadus* standards, we cannot, with that confidence appropriate to judicial action, affirm in favor of Gypsum.

We think that justice would best be served by vacating that part of the judgment dealing with the adverse possession issue and remanding the case for the further consideration of the District Court, taken according to the applicable standards. This may be done on the existing record, as appropriately supplemented by either party, with judgment accordingly. We intimate no opinion as to what the ultimate outcome should be.

*Conclusion*

The Judgment of the District Court holding that that part of Stack Island which crossed the Gypsum north boundary line became the property of Gypsum is affirmed.

That part of the Judgment which decided the adverse possession issue is vacated and remanded for further proceedings not inconsistent herewith, each party to bear its own appellate costs.

AFFIRMED in part.

VACATED and REMANDED in part.