# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00707-COA

**BOBBY W. ANDERSON**                                                    **APPELLANT**

**v.**

**JERRY FISHER, EDSEL FISHER, WOODLEY D.**                    **APPELLEES**
**FISHER AND RAYMOND L. FISHER, AND ALL**
**OTHER PERSON/ENTITIES HAVING OR**
**CLAIMING ANY LEGAL OR EQUITABLE**
**RIGHT, TITLE, OR INTEREST IN THE**
**FOLLOWING DESCRIBED PROPERTY: LOTS**
**29 AND 30 IN SECTION 4, TOWNSHIP 16**
**NORTH, RANGE 4 EAST; AND LOTS 1 AND 2**
**IN SECTION 9, TOWNSHIP 16 NORTH, RANGE**
**4 EAST; LOCATED IN THE SECOND JUDICIAL**
**DISTRICT OF CARROLL COUNTY,**
**MISSISSIPPI**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/11/2018 |
| TRIAL JUDGE: | HON. JOSEPH KILGORE |
| COURT FROM WHICH APPEALED: | CARROLL COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | RICK D. PATT |
| ATTORNEY FOR APPELLEES: | BRYANT WANDRICK CLARK |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 12/03/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1. In 2013, Bobby Anderson filed his complaint to quiet and confirm title to land located in Carroll County, Mississippi. At issue was a disputed section of land on the southern boundary of Lots 29 and 30, which were owned by Anderson, and the northern boundary of

Lots 1 and 2, which were owned by Jerry, Edsel, Woodley, and Raymond Fisher (collectively "the Fishers"). Anderson claimed that, based on a survey completed when he purchased the property, the Fishers were illegally using the land for their own use. In response, the Fishers claimed that they owned the property based on their own survey. The Fishers also counterclaimed that they owned the property by adverse possession. The chancellor found that the Fishers were able to prove by clear and convincing evidence that they owned the land through adverse possession. We affirm the chancellor's ruling.

**FACTS**

¶2. On February 22, 2008, Anderson purchased four lots of land (Lots 27, 28, 29, and 30) in Carroll County, Mississippi. Directly to the south of Lots 29 and 30, the Fisher family owned Lots 1 and 2. The subject of this appeal involves a disputed tract of land at the southern boundary of Lots 29 and 30 and the northern boundary of Lots 1 and 2. The survey that Anderson received before purchasing the land indicated that the disputed tract of land was included within the boundary of Lots 29 and 30. The Fisher family also had a survey that indicated the disputed land was within the bounds of Lot 1 and Lot 2.

¶3. For decades, the Fishers had used the disputed tract of land to farm, hunt, and cut timber. Edsel Fisher testified that the family had also put a road down through the disputed property long before Anderson owned it. Based on their belief that the disputed land was included in their property, the Fishers used flags to indicate their property line. Edsel testified that these flags were replaced every winter for the last ten years. The defense took

2

issue with the Fishers' claim that they flagged their property line because there was no photographic evidence it ever took place.

¶4.     Edsel testified that, for the last thirty years before Anderson filed his complaint, the Fishers had leased the land for hunting to Mark Berryhill. Berryhill testified that he had continually leased the property for hunting for thirty-three years. Berryhill explained that he had "always known where the property line [was] because [it was] flagged." To his knowledge, the flags marking the property line were there for at least fifteen to twenty years.

¶5.     Three separate surveys were done that involved the disputed land. Each were made exhibits at trial. The "Bunch Survey" was completed in 2002 before Anderson purchased the property. The Bunch Survey indicated that the disputed tract of land was within the boundaries of Lot 29 and Lot 30. The second survey was completed in 2013 at the request of the Fishers. Joe Sutherland, who completed this survey, testified that he was able to identify the northeast corner of Lot 1 by an iron pin. The "Sutherland Survey" indicates that there was an existing fence behind the property line and that Sutherland placed an iron pin in the northwest corner of Lot 2.[1] The Sutherland Survey indicated that the disputed land

_____

[1] The "fence remnants" were heavily debated at trial. Edsel testified that there once was a fence on the property for the cattle his family kept there. He told the court, however, that the cattle were never kept on the disputed property. Edsel never indicated that the fencing was the boundary line used for the property. Berryhill testified that, when the fence was still in place, he used that fence as his boundary to hunt. When he could no longer find the fence, however, he testified he went by the flags as a indication of the Fishers' property line. The disputed property was some thirty feet away from the remaining remnants of the prior fence, but nothing in the record leads us to the conclusion that the Fishers took the fence to be the extent of their property.

3

was within the boundaries of Lot 1 and Lot 2. Finally, in 2015, Anderson requested the "Benchmark Survey." Michael Love, a surveyor for Benchmark Engineering, testified that he could not find the iron pin that the Sutherland Survey indicated was in the northeast corner of Lot 1. Love also testified he could not find the pin that Sutherland set in the northwest corner of Lot 2. Even though he could not find the iron pin at the northeast corner, on cross-examination Love testified he found a "brass cap set in concrete" in the southwest corner of Lot 2 that was "[at] the same point [the Sutherland Survey] says he set an iron pin." The Benchmark Survey indicated that the disputed land was within Anderson's property.

¶6. The obvious discrepancies among all three surveys were explained at trial. Sutherland testified that Love used a "State Plane Coordinate" system to do his survey. This new type of surveying used GPS and other technology that Sutherland did not use. Although he admitted that the Benchmark and Bunch surveys placed the disputed land within Lots 29 and 30, Sutherland testified that the two surveys were not exactly the same. Sutherland said that he was confident in his findings that the tract of land was actually inside of the Fishers' property.

¶7. The chancellor stated in his bench opinion that he could see how there would be a thirty-five foot variance because of the different methods. Because the issue before the court was adverse possession, and the chancellor found it to be dispositive, the chancellor declined to consider which survey was more credible. After the chancellor considered all of the evidence and the testimony from the witnesses, he found that the Fishers owned the property

4

through adverse possession.

## STANDARD OF REVIEW

¶8.     It is well settled that, unless the findings were manifestly in error, clearly erroneous, or the product of an erroneous legal standard, the chancellor's findings will not be disturbed. *O'Neal v. Blalock*, 220 So. 3d 234, 239 (¶10) (Miss. Ct. App. 2017). All determinations of the court's interpretation and application of the law will be reviewed de novo. *Id*. (citing *Keener Props. LLC v. Wilson*, 912 So. 2d 954, 956 (¶3) (Miss. 2005)).

## ANALYSIS

¶9.     Anderson argues that the chancellor's findings were in error because the chancellor did not take into consideration the testimony of the expert witnesses, which he believes disproves the Fishers' claim of title by adverse possession. We disagree with Anderson and find that the evidence at trial supports the chancellor's finding that the Fishers owned the property through adverse possession.

¶10.    Mississippi Code Annotated section 15-1-13(1) (Rev. 2012) provides:

> Ten (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title. . . .

In order to perfect title by adverse possession, a claimant must prove by clear and convincing evidence[2] that possession was "(1) under the claim of ownership; (2) actual or hostile; (3)

---

[2] The dissent expresses concern about the "erosion" of the clear and convincing proof necessary for adverse possession claims to legally occur. While those concerns are certainly

open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *O'Neal*, 220 So. 3d at 240 (¶13) (quoting *Roberts v. Young's Creek Inv. Inc.*, 118 So. 3d 665, 669 (¶7) (Miss. Ct. App. 2013)). The burden placed on the claimant is exceedingly lofty. "Clear and convincing evidence is such a high standard of proof that even the overwhelming weight of the evidence does not rise to the same level." *Id*. (internal quotation mark omitted) (quoting *Massey v. Lambert*, 84 So. 3d 846, 848 (¶7) (Miss. Ct. App. 2012)). Arguably, each element for adverse possession supports the chancellor's decision.

### I.     Under the Claim of Ownership

¶11.   To determine ownership and any claim that the adverse possessor may have, this Court must consider "whether the possessory acts relied upon by the would be adverse possessor are sufficient to fly his flag over the lands and to put the record title holder on notice that the lands are held under an adverse claim of ownership." *O'Neal*, 220 So. 3d at 240 (¶14) (quoting *Hill v. Johnson*, 27 So. 3d 426, 431 (¶19) (Miss. Ct. App. 2009)). "[W]ild or unimproved lands may be established by evidence of acts that would be wholly insufficient in the case of improved or developed lands." *Id*. (quoting *Apperson v. White*, 950 So. 2d 1113, 1117 (¶8) (Miss. Ct. App. 2007)).

---

valid and prime for a consideration of our present legal use of adverse possession as to rural lands, in this case the chancellor found the property was adversely possessed by the Fishers through clear and convincing evidence. This Court cannot act as a new finder of fact when the record supports the findings of the chancellor.

¶12. The chancellor took into consideration that the Fishers had leased land to Mark Berryhill for hunting.[3] Edsel Fisher testified that the family had leased the disputed tract of land to Berryhill beginning in the 1980s. Berryhill testified that he was aware of the boundaries because of the flagging and that the Fishers had "always showed [him] where the line was on every part of the land." Berryhill recalled that the property had been flagged "at least [fifteen] to [twenty] years."

¶13. The record indicates that the Fishers identified their land to Berryhill by using flags or ribbons. This, the chancellor found, was indicative of ownership. Edsel testified that the property was always kept flagged and that "every winter they would reflag the line and that they had been doing this for ten years or so." This was confirmed by Sutherland, who said he did find old flags along the property line claimed by the Fishers. Sutherland noticed the flags "fifteen to twenty years ago."

¶14. Anderson, however, argues that the flags the Fishers set out were not prevalent enough to indicate ownership. At trial and on appeal, Anderson voiced opposition to the Fishers' claim of ownership because there were no photographs or "tangible proof" offered

---

[3] The dissent makes much-to-do about Berryhill never actually hunting the disputed tract of land. However, the chancellor acknowledged this fact. In his bench opinion, the chancellor found that "the Fishers indicated to Berryhill that the disputed property was theirs by pointing out the flags. They allowed him to hunt on it, even though he testified he never did." While not hunting the land is one piece of evidence to consider, the existence of a hunting lease for the disputed tract of land indicates the right to hunt the land in its entirety, which is evidence that the Fishers exerted control and ownership over the land. That was part of the clear and convincing evidence that the chancellor found and relied upon.

7

about the flags and markings on the property. The chancellor took this argument under consideration but ultimately found the testimony of Edsel Fisher and Berryhill as credible evidence of the flags' placement and the Fishers' assertion of ownership over the land.[4] The chancellor found that the evidence supported that the Fishers had proved ownership by clear and convincing evidence.

## II.    Actual or Hostile

¶15.    For possession of a disputed property to be hostile, possession must be without permission because "permission defeats any claim of adverse possession." *Roberts*, 118 So. 3d at 670 (¶10) (citing *Apperson*, 950 So. 2d at 1118 (¶12)). "Possession is hostile and adverse when the adverse possessor intends to claim title notwithstanding that the claim is made under the mistaken belief that the land is within the calls of the possessor's deed." *Id*. (quoting *Wicker v. Harvey*, 937 So. 2d 983-94 (¶34) (Miss. Ct. App. 2006)). Not only did the Fishers need to possess the property, but that possession had to be hostile to satisfy the second element of the claim.

¶16.    In *Roberts*, this Court found that Young's Creek possessed the disputed 7.79 acres of property because it built deer stands and planted trees. *Id*. at 670 (¶11). Even though Roberts had not seen Young's Creek build and plant, we found that the "actions were blatant

---

[4] The Fishers asserted their ownership of the land by marking their property line with "flags" or "ribbons" each year. Edsel testified that the flags had been in place for "ten years or so," and Berryhill told the court it was "at least fifteen to twenty years" that he had noticed the flags on the boundary line.

enough to be visible to the eye and perceptible to the senses." *Id*. We then turned to the requirement that the possession be hostile. We held that Young's Creek mistakenly thought that the property was included in their deed, and because Young's Creek had farmed the land in years past, the possession was hostile. *Id*. The same can be said for the present case.

¶17. At trial, the chancellor heard testimony that the land was farmed by the Fisher family in the 1950s and the 1960s.[5] The land was also leased out as hunting land for the last thirty-three years. The chancellor relied on Edsel's testimony that, based on the belief that his property line was more north, he began to flag the line about ten to fifteen years prior to Anderson's claim. Edsel based this line off of an earlier survey. The chancellor found that this satisfied the element of hostile possession.

### III. Open, Notorious, and Visible

¶18. In order to satisfy the requirement that possession was open, notorious, and visible, the possessor "must unfurl his flag on the land, and keep it flying, so that the actual owner may see, and if he will, that an enemy has invaded his domains, and planted the standard of conquest." *Id*. at 670 (¶13) (quoting *Wicker*, 937 So. 2d at 994 (¶35)).

¶19. The Fishers, quite literally, "unfurl[ed] [their] flags on the land" by planting flags on

---

[5] The dissent indicates Edsel Fisher only testified that he had farmed the land a few years while he was in high school. However, Edsel also testified that his "grandfather" had also farmed the disputed land. The chancellor specifically found that "Edsel recalled that his grandfather farmed the disputed strip. His memory extends back to somewhere between 1948 and 1950." Therefore, the chancellor found by clear and convincing evidence that the farming "was perceptible to the senses" and that the possession was actual and hostile.

9

what they thought to be their property line. As the chancellor noted, "the flags were visible as verified by Berryhill," and the farming and hunting done on the property over the decades was also visible. The Fishers' brief indicates that Anderson does not live on the property or even in the county, but Anderson could have easily discovered the flags or the visible deer stands that were installed for hunting "by merely walking [his] property and observing its state." *Apperson*, 950 So. 2d at 1118 (¶13). The chancellor found significant evidence to conclude the adverse possession was open, notorious, and visible.

IV. *Continuous and Uninterrupted for a Period of Ten Years*

¶20. In order to satisfy the continuous and uninterrupted element of adverse possession, Mississippi Code Annotated section 15-1-13 requires possession for at least ten years. Occasional or "sporadic use" does not arise to the level of continuous and uninterrupted use. *O'Neal*, 220 So. 3d at 242 (¶24) (quoting *Ellison v. Meek*, 820 So. 2d 730, 736 (¶21) (Miss. Ct. App. 2002)). The record is silent as to any owner other than the Fishers who used the disputed land from the 1950s until 2003. Beyond that, Berryhill testified that he had leased the property from the Fishers for the last thirty-three years—well over the statutory requirement of ten years. Berryhill made it clear that there was never a gap in his lease from the Fishers. The chancellor found that the Fishers proved the necessary element of continuous possession by clear and convincing evidence.

V. *Exclusive*

¶21. "Exclusive possession means that the possessor 'evinces an intention to possess and

10

hold land to the exclusion of, and in opposition to, the claims of all others, and the claimant's conduct must afford an unequivocal indication that he is exercising [the] dominion of a sole owner.'" *Roberts*, 118 So. 3d at 671 (¶15) (quoting *Wicker*, 937 So. 2d at 995 (¶40)). "Exclusivity, within the meaning of the statute, means that the adverse possessor's use of the property was consistent with an exclusive claim to the right to use the property." *Id.* (quoting *Apperson*, 950 So. 2d at 1118 (¶15)) (citing *Moran v. Sims*, 837 So. 2d 1067, 1069 (¶10) (Miss. Ct. App. 2004)). As the chancellor noted in his bench opinion, "it does not mean that no one else can use the property." *O'Neal*, 220 So. 3d at 243 (¶26) (quoting *Wicker*, 937 So. 2d at 995 (¶40)).

¶22. Testimony at trial indicated that there had never been a claim over the disputed tract of land until Anderson filed his claim in 2013. The Fishers were unaware of anyone else who used the property unless the Fishers gave them permission. The chancellor noted that Edsel testified that the previous owners of Lot 29 and Lot 30 had cut timber on the property in the 1970s but had stopped short of the disputed property. The chancellor found the adverse possession to be exclusive.

    *VI.    Peaceful*

¶23. There is no indication from the record that the possession and use of the property was anything but peaceful. "An adverse possessor's use of a claimed property must be peaceful." *O'Neal*, 220 So. 3d at 243 (¶28) (quoting *Scott v. Anderson-Tully Co.*, 154 So. 3d 910, 915 (¶28) (Miss. Ct. App. 2015)). The chancellor found that the possession was peaceful.

**CONCLUSION**

¶24. The evidence presented at trial indicates that the Fishers proved by clear and convincing evidence each of the elements required to prove title through adverse possession. Our review of the record indicates that the chancellor was presented with more than enough evidence to reach his conclusion. That evidence, in fact, is sufficient and supports the chancellor's factual findings. While Anderson argues that the chancellor should have relied on the expert testimony presented in this case, the testimony of the witnesses provided more than enough credible proof to apply the facts to the existing law and find that the Fishers owned title to the disputed land. As such, this Court finds that the chancellor did not abuse his discretion and affirms.

¶25. **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS AND McDONALD, JJ., CONCUR. McCARTY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. TINDELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON AND J. WILSON, P.JJ., McCARTY AND C. WILSON, JJ.**

**TINDELL, J., DISSENTING:**

¶26. It is well established that "[t]he credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *Polk v. Polk*, 559 So. 2d 1048, 1049 (Miss. 1990) (quoting *Rainey v. Rainey*, 205 So. 2d 514, 515 (Miss. 1967)). Furthermore, it is of the utmost import that this Court be bound by the "severely limited substantial[-]evidence/manifest[-]error standard of review." *Stallings v. Bailey*, 558

12

So. 2d 858, 861 (Miss. 1990) (citing *Savage v. Parrish*, 488 So. 2d 1342, 1342 (Miss. 1986); *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985)). I believe, however, that we are equally required to not erode the extraordinarily high clear-and-convincing standard of proof necessary to take the property of another through adverse possession. If the chancellor's decision in this case is affirmed, I believe such an erosion will occur. I therefore must respectfully dissent from the lead opinion affirming the chancellor's finding of adverse possession.

¶27. For generations our courts have recognized that adverse possession is a legal means by which one takes property from another without payment of valuable consideration. That being the case, to prevail upon an adverse-possession claim, one must prove each of the six required elements by the extraordinarily high clear-and-convincing standard of proof. *West v. Brewer*, 579 So. 2d 1261, 1262 (Miss. 1991). "Clear and convincing" is a high order of proof that requires even more proof than "overwhelming weight of the evidence." *Bailey v. Woodcock (In re C.B.)*, 574 So. 2d 1369, 1375 (Miss. 1990). In most cases, the underlying question "is whether the possessory acts relied upon by the would[-]be adverse possessor are sufficient to put the record title holder upon notice that the lands are held under an adverse claim of ownership." *Peagler v. Measells*, 743 So. 2d 389, 390 (¶7) (Miss. Ct. App. 1999).

¶28. Here, the record simply lacks the indispensable clear-and-convincing proof necessary for the Fishers to prevail on their adverse-possession claim of the disputed property. The lead opinion contends that the chancellor's finding of adverse possession met the clear-and-

13

convincing standard because the Fishers had (1) leased the land to Berryhill for hunting; (2) flagged the property line; and (3) farmed the disputed property in the 1950s and 1960s. However, a deeper assessment of these contentions is warranted, and upon closer examination, I find the Fishers' claims fail to meet several elements necessary for adverse possession.

### 1. The Hunting Lease

¶29. "To stake a claim of ownership, the possessor must fly his flag over the property in such a way as to put the actual owner on notice that the property is being held under an adverse claim of ownership." *Scott v. Anderson-Tully Co.*, 154 So. 3d 910, 916 (¶15) (Miss. Ct. App. 2015) (internal quotation marks omitted). "The quality, not the quantity, of acts must be considered." *Id.*

¶30. As the lead opinion states, the chancellor here took into consideration that the Fishers had leased their entire property to Berryhill for over thirty-three years.[6] Lead Op. at ¶12. The lead opinion concludes that "Anderson could have easily discovered . . . the visible deer stands that were installed for hunting 'by merely walking his property and observing its state.'" *Id.* at ¶19 (quoting *Apperson v. White*, 950 So. 2d 1113, 1118 (¶13) (Miss. Ct. App. 2007)). However, when Berryhill testified on direct examination about hunting on the actual property in dispute, he offered the following testimony:

---

[6] The record is void as to whether the hunting lease agreement was a written agreement or an oral agreement.

14

Q.    Leasing land and actually using the land is two different things.

A.    Uh-huh.

Q.    On the disputed property, do you recall actually hunting on that piece of property--the property that's actually in dispute?

A.    No.  No.

Q.    Okay.  But have you ever gone over there--

A.    I may have driven down to see where Edsel Fisher made the bulldozer--I went across there.  I did go and look to see . . . where he made that lane.  I did that.  But I still never hunted over there.[7]

Q.    I'm talking about on the disputed part.

A.    Uh-huh.

Q.    Not over on the Anderson side.

A.    I never hunted on the disputed side.  I never hunted on Anderson's land.

¶31.    Berryhill repeatedly testified that he never used the disputed property for hunting at any time during the thirty-three years he leased the Fishers' property.  Berryhill even admitted that any deer stands he erected were on the Fisher side of the old fence remnants that he originally understood to be the property line.  Although the Fishers later advised him that their property continued past the old fence remnants, he still never utilized the disputed property.  In his bench opinion, the chancellor acknowledged that "Berryhill did not actually hunt on the disputed property . . . ."  Even so, the chancellor concluded "that is not what is

_____

[7] When the dispute arose between Anderson and the Fishers, the Fishers bulldozed a lane along what the Fishers contended was the property line.

15

important under this element" of claim of ownership. To the contrary, I find the fact that Berryhill never actually hunted on the disputed property to be very important. How else was Anderson or his predecessors in title to even know the land was being used by another? As other states have held, "[a] mere mental enclosure of land does not constitute the requisite actual possession" required to stake a claim of ownership by way of adverse possession. *Murphy v. Holman*, 289 S.W.3d 234, 238 (Mo. Ct. App. 2009); *see also Estate of Welliver v. Alberts*, 663 N.E.2d 1094, 1099 (Ill. App. Ct. 1996) ("[C]ourts have determined that, while the intent to take control of wild and undeveloped land requires a lesser exercise of actual ownership by affirmative act than with other property, the actual ownership must still be more than mere mental enclosure." (internal quotation marks omitted)). In other words, since Berryhill never actually hunted the disputed property, the mere fact that he entered into a hunting lease agreement with the Fishers is inconsequential because it offers no proof of occupancy or actual possession.

### 2. Flying the Flag

¶32. "A landowner must have notice, actual or imputable, of an adverse claim to his property in order for it to ripen into title against him, and the mere possession of land is not sufficient to satisfy the requirement of open and notorious possession." *People's Realty & Dev. Corp. v. Sullivan*, 336 So. 2d 1304, 1305 (Miss. 1976). Under this element, an adverse possessor must again "fly his flag over the lands" of the documented owner. *O'Neal v. Blalock*, 220 So. 3d 234, 240 (¶14) (Miss. Ct. App. 2017) (quoting *Hill v. Johnson*, 27 So.

16

3d 426, 431 (¶19) (Miss. Ct. App. 2009)). Mississippi caselaw has repeatedly recognized that "[t]he mere presence of a fence, without more, has never been sufficient to sustain a claim of adverse possession." *Double J Farmlands Inc. v. Paradise Baptist Church*, 999 So. 2d 826, 829 (¶15) (Miss. 2008); *accord Davis v. Clement*, 468 So. 2d 58, 63 (Miss. 1985); *Harmon v. Buckwalter*, 233 Miss. 761, 763-66, 102 So. 2d 895, 896-98 (1958); *Snowden & McSweeny Co. v. Hanley*, 195 Miss. 682, 686-88, 16 So. 2d 24, 25-26 (1943).

¶33. The lead opinion states that "[t]he Fishers, quite literally, 'unfurled their flags on the land' by planting flags on what they thought to be their property line." Lead Op. at ¶19. To be perfectly clear, there were no flags. According to Edsel, he would "flag the property line" by tying pink ribbons along trees he believed to be on the property line. Edsel testified that every winter for about "ten years or so" his family would place ribbons upon trees on what he believed was the property line. Our courts have previously recognized that validating a property line using a bright paint is a preferred method of establishing effective control of property of this nature. *Jackson v. Peoples Bank*, 869 So. 2d 422, 424-25 (¶¶8-10) (Miss. Ct. App. 2004). The Fishers offered no testimony in this case to support a contention that tying pink ribbons to random trees would have the same effect as using bright paint to validate a property line. Nor should any contention, if offered, be accepted. If a fence alone is insufficient to support a claim for adverse possession, then so, too, is marking a property line by tying ribbons to trees. Obviously, painting a property line in such a manner or placing "no trespassing" or "private property" signs provides a more open, obvious, and visible marker

17

than tying a ribbon on a tree.

### 3. Farming the Disputed Property

¶34. The only evidence offered by the Fishers of actual possession of the land came from the Fishers themselves. And although the Fishers testified that their grandfather farmed over the disputed area, they admitted that the farming took place for only four or five years. In discussing his grandfather's farming of the disputed property, Edsel testified as follows:

Q. I mean, are you saying that the stuff that you said that happened on this disputed land--are you telling the court that all of this was just open and obvious and an obvious claim that y'all had to everybody that this was . . . your land?

A. No, sir, not to everybody. We was sure it was our land.

Q. Okay. And you said that, you know, y'all would farm a little bit--you farmed for about four or five years; then you did some other stuff; then you did some other stuff. Can you identify one uninterrupted ten-year period when y'all were doing all of this stuff?

A. Well, we farmed basic[ally] . . . all . . . through high school . . . .

Q. And I think you testified that you remember farming from the age of 14 until you were about 18 or 19?

A. Yeah.

Q. Okay.

A. Yes[,] sir.

Q. For like a five-year period?

A. Yes[,] sir.

¶35. Mississippi Code Annotated section 15-1-13(1) (Rev. 2012) requires continuous and

18

uninterrupted possession of a disputed property for at least ten years. "[O]ccasional use of someone else's property without an enclosure does not pass the test of adverse possession." *Ellison v. Meek*, 820 So. 2d 730, 736 (¶21) (Miss. Ct. App. 2002). In addition, sporadic "use of another's property does not constitute open and notorious possession." *Id.* Here, Edsel himself could not identify any ten-year time period when he or his family utilized the disputed property.

¶36. In addition, our caselaw establishes that "[t]he adverse possessor must . . . possess the property without permission, because permission defeats any claim of adverse possession." *Roberts v. Young's Creek Inv. Inc.*, 118 So. 3d 665, 670 (¶10) (Miss. Ct. App. 2013) (citing *Apperson*, 950 So. 2d at 1118 (¶12)). Interestingly, Edsel testified that at the time the land was farmed his grandfather's father-in-law owned what is now the Anderson property and that the land was later passed down to his brother-in-law upon his father-in-law's death. This is important to note because, while there was testimony that the Fishers' grandfather farmed the land, there was no evidence offered about the circumstances of how it came to be farmed. Considering that at the time the disputed land was farmed the property then belonged to the Fishers' grandfather's father-in-law, we do not know if the Fishers' grandfather had permission to farm it or if it was in fact a hostile occupation. Again, this is the Fishers' burden to prove. It is also important to recognize that the Fishers did not pay the property taxes for the disputed property; Anderson did. The "[p]ayment of taxes" has also been found to be "very important and strong evidence of a claim of title." *Wicker v. Harvey*, 937 So. 2d

983, 995 (Miss. Ct. App. 2006) (quoting *McCaughn v. Young*, 85 Miss. 277, 293, 37 So. 839, 842 (1905)).

¶37.    Our caselaw recognizes that "[a]dverse possession of 'wild' or unimproved lands may be established by evidence of acts that would be wholly insufficient in the case of improved or developed lands." *Walker v. Murphree*, 722 So. 2d 1277, 1281 (¶16) (Miss. Ct. App. 1998) (quoting *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985)). This does not mean, however, that the standard of proof required to show adverse possession is somehow diminished in such a case. As previously discussed, "[t]he question in the end . . . [still remains] whether the possessory acts relied upon by the would[-]be adverse possessor are sufficient to fly his flag over the lands and to put the record title holder upon notice that the lands are held under an adverse claim of ownership." *Id.* (quoting *Johnson*, 469 So. 2d at 90-91). In other words, while "such occupancy and use is not as rigidly or literally required in order to establish a claim of adverse possession for land which does not lend itself to permanent, useful improvement[,]" the "[p]ossession of such property" must still "be established by a continued claim evidenced by public acts of ownership." *Cole v. Burleson*, 375 So. 2d 1046, 1048 (Miss. 1979). Indeed, in the line of cases where adverse possession of wild lands has been granted, the supporting evidence of public acts of ownership has been significantly stronger.[8]

---

[8] *See Kayser v. Dixon*, 309 So. 2d 526, 529 (Miss. 1975) (finding the adverse possessors brushed out and maintained a boundary line for over ten years, painted the timber between the white and orange boundary lines to signify it should not be cut, "cut and carried

20

¶38.    To give weight to the previously mentioned evidence over the clear wording of a

deed's legal description would be a giant step away from the clear-and-convincing standard

of proof required to prove the elements for adverse possession.  As a matter of public policy,

Mississippi should favor the openness of forest by land owners.  The necessary implication

of an adverse-possession determination based upon the facts presented here is that a

titleholder of large areas of hunting or forest land must either fence in his or her lands and

---

posts off the land, thinned the hardwood, grazed cattle annually, . . . maintained posted signs near the white line at road entrances[,]" and had their attorney send the Appellants a letter claiming ownership of the disputed land and warning of a lawsuit if the Appellants made "further attempts to use the land between the white and orange lines"); *Geoghegan v. Krauss*, 228 Miss. 231, 240-42, 87 So. 2d 461, 464-65 (1956) (finding that the adverse possessors constructed and repaired fences around the land; grazed their cattle on the land; executed various timber deeds, mineral leases, and a pipeline easement to the land; warned others not to trespass on the land or to cut and remove the timber; placed signs near the boundary line that were visible from the public road; and paid taxes on the land); *Broadus v. Hickman*, 210 Miss. 885, 893, 50 So. 2d 717, 720 (1951) (noting that the adverse possessor "took possession; went upon the property; paid taxes for five years; gave a turpentine lease, under which visible acts upon the trees were performed by the lessee; from year to year burned fire guards; had the property surveyed, the corners established and marked, grazed some trees along the survey; transplanted many trees; did other acts as above enumerated, and actually paid out to others in taxes and in improving and protecting the property, not counting his own time and labor, $233.64"); *McCaughn v. Young*, 85 Miss. 277, 277, 37 So. 839, 842 (1905) (finding adverse possession where the "Appellant and his predecessors paid the taxes for a long term of years, during which the [the A]ppellee neither paid taxes nor asserted any claim to the land[,]" "used the timber from the land in the same way and to the same extent that he used timber from other lands admittedly his; he sold timber from the land to others with the knowledge of [the A]ppellee; he placed mortgages of record on the land, and offered the same for sale to the public"); *Apperson*, 950 So. 2d at 1117-18 (¶¶9-11) (finding that the adverse possessors' substantial ownership actions included constructing and maintaining a barbed-wire fence as the property line for sixty years, terracing the parcel to plant corn, clear cutting the land, and continuously harvesting timber for over forty years).

21

be overly diligent about keeping periodic trespassers off or face the risk of losing title.

¶39.    Because I find that the Fishers failed to present clear-and-convincing proof of adverse possession in the present case, I respectfully dissent from the lead opinion. I would reverse the chancellor's judgment and remand this case for further proceedings to determine the disputed property's boundary line based upon the legal title and the expert opinions of surveyors.

**CARLTON AND J. WILSON, P.JJ., McCARTY AND C. WILSON, JJ., JOIN THIS OPINION.**